[No. B031797. Second Dist., Div. Seven. July 18, 1991.]

ELYSIUM INSTITUTE, INC., et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

412

414

416

**COUNSEL**

Stephen F. Rohde and Gregory T. Victoroff for Plaintiffs and Appellants.

De Witt W Clinton, County Counsel, and Karen A. Lichtenberg, Deputy County Counsel, for Defendants and Respondents.

OPINION

LILLIE, P. J.—Elysium Institute, Inc., and Churchill Land Corporation (Elysium) appeal from a judgment denying their petition for writ of mandamus (Code Civ. Proc., § 1094.5) wherein Elysium (1) challenged the April 1, 1986, decision of the County of Los Angeles Board of Supervisors denying Elysium's application for nonconforming use permit and structure review to continue operation of a nudist camp and (2) challenged the constitutionality of Los Angeles County Zoning Ordinance No. 10,366 pertaining to nudist camps.

FACTUAL AND PROCEDURAL BACKGROUND

The following factual and procedural background is gleaned from the pleadings herein, the trial court's statement of decision, and the findings in the April 1, 1986, revised findings of the board of supervisors and order, which findings the trial court found to be supported by the weight of the evidence.

Since 1968, Elysium, a nonprofit corporation, has operated what it describes as a "private clothing-optional recreational and educational facility," on about seven acres of gently sloping to hilly land on North Robinson Road in the unincorporated community of Topanga in Los Angeles County. The land, owned by Churchill Land Corporation, contains two former single-family residences with communal accommodations, wherein lived twelve staff members of Elysium. Other developments on the property include a swimming pool, sauna, whirlpool, tennis courts, barn, stable, and a lighted parking facility for 182 vehicles. A six-foot solid wood fence and a solid bank of mature and combustible eucalyptus and pine trees surround the northern and eastern boundaries of the property.

In 1986, Elysium had about 1,000 members, who had a total of about 400 dependent children; Elysium was open to members and their guests every day except Monday; the former single family residences contained accommodations for 20 to 30 overnight guests; outdoor camping and recreational vehicles were also permitted at Elysium. The peak activity at Elysium is during the summer, when daytime attendance may exceed 325, and as many as 30 people stay overnight on weekends. Seminars and workshops for small groups, including nonmembers, may be held through 11 p.m.; Elysium also holds open houses to which the general public is invited.

The area surrounding Elysium contains clusters of single family development off of Robinson and Winfield Roads to the north and east, interspersed

with considerable vacant land, giving the neighborhood an overall rural character; several private residences are in close proximity to the parking lot at the west end of Elysium; one residence is located to the south of Elysium, the remaining land being a state park.

The main entrance to Elysium is from Robinson Road, a private easement with a paved width varying from 12 to 22 feet; the narrowness of the road is exacerbated by steep to rolling vertical alignment and blind curves; comparable commercial densities currently require 40-feet wide roadways; as Elysium's policy is that guests must arrive in the same car as a member, the policy suggests that guests park on Topanga Canyon Boulevard and ride with members up to Elysium; Topanga Canyon Boulevard is principally two lanes wide with limited off-road parking; the parking policy tends to congest the roadway, contrary to the rural character of the area. Robinson Road was not constructed to accommodate the current traffic volume; the traffic imposed by Elysium on the surrounding residential community is several times greater than that which would exist if the property were used for single family residential purposes. Given the high fire hazard in the area, the lack of adequate emergency access to Elysium is a hazard.

The septic system at Elysium is inadequate to support the commercial land use and may be a health hazard to the community; the night time activities at Elysium also generate noise and an increased traffic flow on Robinson Road, creating an adverse impact on the neighboring residents.

Elysium and the surrounding area are zoned A-1-1 (light agriculture; one-acre minimum lot size; hereinafter referred to as zone A-1); this zoning classification is intended principally for rural residential and light agricultural uses. Prior to the enactment of Los Angeles County Ordinance No. 10,366, effective November 5, 1971, nudist camps were a permitted use in zone A-1. Ordinance No. 10,366 restricted nudist camps to zone A-2 (heavy agriculture) with an approved conditional use permit.

As of November 5, 1971, Elysium became a legal nonconforming use; according to the terms of the ordinance, Elysium's nonconforming use was to be discontinued in five years, unless revoked or Elysium obtained permission to extend its use. After the adoption of the ordinance, the Los Angeles County Regional Planning Commission (Commission) held hearings to determine whether the legal nonconforming status of Elysium should be modified or revoked; in February 1976, the Commission rendered a decision in favor of Elysium.

Thereafter, Elysium filed a timely application for an extension of the five-year termination period wherein Elysium maintained that the investments in

land and improvements had not been fully amortized and that the ordinance was unconstitutional. The Commission and the board of supervisors, on appeal, each voted to deny Elysium's application. Elysium challenged these decisions by petition for writ of mandamus filed in April 1980 in the superior court; while the matter was pending, Los Angeles County amended its code to liberalize the findings needed to grant an extension. In light of the amendment, the court remanded the case back to the county for further administrative proceedings.

In 1983 and 1984, the county zoning board conducted de novo hearings on the requested nonconforming use extension; in May 1984, the Commission granted a permit authorizing Elysium to continue in operation for another five years, subject to twenty-seven conditions. Elysium appealed the Commission's decision to the board of supervisors (Board), challenging 10 of the conditions. The Board noticed a de novo hearing and in December 1984 took the entire matter under submission, tabling its decision until the preparation and submission of a report by the county's geological engineer on the geological stability of Elysium's property. Apparently without waiting for the report, the Board voted to deny Elysium's application in January 1985. In April 1985, Elysium filed petition for writ of mandamus and also moved for an order remanding the case for consideration of the geological report. The trial court's December 11, 1985, order and judgment provided for the issuance of a writ remanding the matter to the Board to consider additional evidence, but the Board was not required to conduct a public hearing. After reconsidering the entire record, including the additional evidence relating to geological stability, the Board on April 1, 1986, adopted revised findings and denied Elysium's application to continue operation of its nudist camp.[1]

---

[1]The Board's revised findings included the following: "The burden of proof required by County Code for extension of nonconforming uses is as follows: [¶] '1. That to require cessation of such use, building or structure would impair the property rights of any person to such an extent as to be an unconstitutional taking of property; and/or [¶] 2. That such use building or structure does now and will not during the extension period requested: [¶] a. Adversely affect the health, peace or welfare of persons residing or working in the surrounding area, or [¶] b. Be materially detrimental to the use, enjoyment or valuation of the property of other persons located in the vicinity of the site, or [¶] c. Jeopardize, endanger or otherwise constitute a menace to the public health, safety or general welfare.' . . . The present Code requires only that one of these alternate findings [Findings 1 or 2] be made . . . . [¶] No substantial evidence was presented in the record of the present case to establish that failure to grant the requested extension would impair the property rights of any person to such an extent as to be an unconstitutional taking of property. . . . [¶] No substantial evidence was submitted to show that the applicant could not relocate the nonconforming use to land within a proper zone classification for such use. . . . [¶] Based on the foregoing, the Board of Supervisors concludes: That the applicant has not substantiated to the satisfaction of the Board of Supervisors the facts specified in Los Angeles County Code Sections 22.56.1550 or 22.56.040."

In May 1986, Elysium filed the instant petition for writ of mandamus against the County of Los Angeles, Board, and department of regional planning (hereinafter referred to collectively as County), challenging the April 1, 1986, decision on numerous grounds and also challenging the constitutionality of Los Angeles County Zoning Ordinance No. 10,366 on several grounds, including the ground that the ordinance violates the constitutional rights guaranteeing free expression, freedom of assembly and association, and privacy. Elysium also maintained, inter alia, that the ordinance constitutes an unconstitutional taking of property without due process of law or fair compensation; that the classifications of property uses in the ordinance are arbitrary and unreasonable and not reasonably related to a legitimate purpose or objective; and the ordinance is unconstitutionally vague and overbroad.

There is a split of authority as to whether an ordinance is subject to constitutional attack in an administrative mandamus proceeding. *Gong* v. *City of Fremont* (1967) 250 Cal.App.2d 568, 574 [58 Cal.Rptr. 664], holds that an ordinance is not so subject, the proper remedy being an action for declaratory relief. *Floresta, Inc.* v. *City Council* (1961) 190 Cal.App.2d 599, 612 [12 Cal.Rptr. 182], holds that while mandamus is traditionally a procedure for reviewing the action of an administrative agency as to an alleged abuse of discretion, it may also be invoked to challenge the constitutionality of ordinances and regulations. However, both *Gong* and *Floresta* agree that upon appropriate allegations, a mandamus proceeding may be joined with an action for declaratory relief. (250 Cal.App.3d at p. 574; but see, *H.W. Rohl Co.* v. *County of San Diego* (1963) 212 Cal.App.2d 707, 711 [28 Cal.Rptr. 196].) Given the failure of respondents to challenge the propriety of consideration of such constitutional issues by the trial court or by us, we deem the petition to include a complaint for declaratory relief seeking declaration of the unconstitutionality of portions of the zoning ordinance.

On May 23, 1986, the parties stipulated that the Board's April 1, 1986, decision would be stayed pending the entry of judgment in the pending proceeding.

After trial, the court on June 18, 1987, issued a tentative decision in favor of County; Elysium requested a statement of decision; on September 11, 1987, the court issued a statement of decision in which the court stated, inter alia, that in applying its independent judgment to the facts below, the findings of the Board were supported by the weight of the evidence. Judgment denying the writ of mandamus was entered on October 5, 1987. Elysium moved for a new trial on several grounds, including the ground that there was insufficient evidence to support certain portions of the statement

of decision, and the ground that Elysium had newly discovered evidence to support the claim that it had been singled out and discriminated against by County; Elysium's new evidence purportedly showed that the County in fact did not require a conditional use permit of other recreational uses in zone A-1 even though the ordinance required a conditional use permit to continue operation of such other recreational uses after November 1976.

The court denied the motion for new trial, and Elysium filed timely notice of appeal from the judgment. The parties have stipulated to continue the stay of the Board's decision pending appellate review of the matter.

One group of appellants' contentions on appeal can be characterized as constitutional challenges to the validity of various aspects of the County zoning ordinance pertaining to nudist camps. In this regard, appellant contends: (1) the ordinance unconstitutionally restrains federal and state constitutional rights of free expression, freedom of association, privacy, and personal liberty; (2) the classification of nudist camps and their relegation to the A-2 zone while other recreational uses of property are permitted in the A-1 zone violates equal protection principles in that the distinction is not rationally related to a legitimate governmental purpose; (3) portions of the ordinance, Los Angeles County Code sections 22.08.140 and 22.56.1550 (hereinafter referred to as section 22.08.140 and section 22.56.1550), are overbroad and void for vagueness in the former section's definition of "nudist camp" and in the latter section's imposition of standards for an extension of time within which a nonconforming use must be discontinued; and (4) the definition of "nudist camp" is unconstitutional in that it violates the right of privacy under *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219]; and (5) the zoning ordinance constitutes a "taking" of property under *Nollan* v. *California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141].

Appellants also contend that the trial court's statement of decision is deficient for failing to contain findings on a number of issues;[2] that there is

---

[2]As to the issue of the constitutionality of the ordinance, the statement of decision provided: "Petitioners' operation of a clothing-optional recreational facility, at this location and without regard to the manner of operating, is not a fundamental right protected by the Constitutions of the United States and the State of California of such a nature as to relieve Petitioners of the requirement of compliance with legal and proper zoning requirements."

Despite the fact that the trial court's statement of decision does not expressly address the issue of the validity of the ordinance's definition of "nudist camp," or the issues of due process and equal protection, any irregularity as to the statement of decision with respect to those issues was nonprejudicial and does not require redress on our part. (*City of Coachella* v. *Riverside County Airport Land Use Com.* (1989) 210 Cal.App.3d 1277, 1292 [258 Cal.Rptr. 795].) "It is axiomatic that a statement of decision is required only as to issues of fact decided by the trial court . . . , not as to issues of law." (*Id.*, at pp. 1291-1292.) On the instant record,

insufficient evidence to support several paragraphs of the statement of decision; and the court erred in failing to grant the motion for new trial.

■■■■ Before discussing appellants' contentions regarding the constitutionality of the zoning ordinance with respect to nudist camps, we think it important to discuss appellants' contention that the practice of nudism at Elysium constitutes protected *speech* under the First Amendment of the United States Constitution or under article I, section 2 of the California Constitution.[3] It is also necessary to resolve the issue of whether the practice of nudism at Elysium constitutes speech in order to properly evaluate appellants' other contentions, many premised upon the claim that nudism is a form of protected speech.

I

ELYSIUM'S PRACTICE OF NUDISM DOES NOT CONSTITUTE SPEECH

Appellants attempt to support the contention that its practice of nudism constitutes speech by citing a line of cases dealing with nude entertainment and by relying on the doctrine of collateral estoppel. We address the latter argument first.

A. *Collateral Estoppel.*

■■■ Appellants claim that the County is collaterally estopped to deny their claim that nudism constitutes a "form of personal non-verbal expression and as such may come within the peripheral protection" of the First Amendment to the United States Constitution, because a 1972 unpublished opinion of Division Three of the Second District Court of Appeal so stated in

---

not only are the issues pertaining to the constitutionality of the ordinance ones of law, but to the extent the trial court erred in failing resolve those issues, we may make a final determination of the rights of the parties from the record on appeal and to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination. (See, e.g., *Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1170 [221 Cal.Rptr. 675].)

[3]Article I, section 2, subdivision (a) of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

Appellants opening brief states that "Nudism is a system of beliefs and practices. It is a living philosophy. . . . [¶] Nudism promotes a holistic attitude toward body and mind. It is impossible to meaningfully advance nudism without actually assembling in the nude." Appellants characterize the practice involved in this case as "private recreational nudism." Although appellants do not define "nudism," for purposes of this decision, we define it as "the practice of going nude [especially] in sexually mixed groups and during periods of time spent at specially secluded places." (Webster's New Collegiate Dict. (9th ed. 1985) p. 811, col. 1.)

invalidating a county licensing ordinance. (*Lang* v. *Justice Court of the Malibu Judicial District* (Mar. 24, 1972) 2d Civ. No. 38592.) This 1972 case involved an appeal by Erwin Lang, the director of Elysium, from an order refusing to prohibit his criminal prosecution for operating a growth center without a county license. In concluding that Lang's criminal prosecution should be prohibited, the court of appeal held that "as applied to growth or nudity centers . . . the county license ordinance (No. 5860) is unconstitutional on its face in various of its requirements for the issuance and revocation of licenses and in the unreasonable right of entry it imposes upon those occupying licensed premises."

■ "Generally, collateral estoppel bars the party to a prior action, or one in privity with him, from relitigating issues finally decided against him in the earlier action." (*City of Sacramento* v. *State of California* (1990) 50 Cal.3d 51, 64 [266 Cal.Rptr. 139, 785 P.2d 522].) But when the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed. (*Ibid.*)

Collateral estoppel may apply to "a question of law raised in a subsequent action where both causes of action arise out of the same subject matter or transaction." (*Moore* v. *Panish* (1982) 32 Cal.3d 535, 540, fn. 5 [186 Cal.Rptr. 475, 652 P.2d 32].)

■ Although the issue of whether Elysium's private recreational nudity constitutes speech is one of law, the instant case arises out of a different transaction than the prior criminal prosecution. This case arises out of administrative proceedings involving a zoning ordinance, an entirely different proceeding and ordinance than involved in the prior case. Moreover, judicial resolution of the instant issue requires us to announce a rule of law which will apply to persons other than the instant litigants and perhaps in other circumstances. As we conclude that precluding the court from reexamining the issue would not serve the public interest, we decline to apply the doctrine of collateral estoppel and examine the issue on its merits.

B. *Appellants Fail to Establish Private Recreational Nudity Is Speech.*

■ "The essence of the issue whether an activity falls within the constitutional protection of 'speech' is whether the 'speaker,' by engaging in the activity, is communicating information of any sort." (*Spiritual Psychic Science Church* v. *City of Azusa* (1985) 39 Cal.3d 501, 508 [217 Cal.Rptr. 225, 703 P.2d 1119].)

Nudity " 'is protected as speech only when combined with some mode of expression which itself is entitled to first amendment protection.' [Citation].

[¶] All of the reported cases adhere to this view that the constitution does not protect unassociated nudity from exposure to governmental limitations. In *Williams* v. *Kleppe*, 539 F.2d 803 (1st Cir. 1976), the court sanctioned a ban on nude sunbathing in a national park. In response to the plaintiff's first amendment arguments, the court agreed with the district court's conclusion that 'no rights of free speech can be said to have been involved here.' . . . Justice Douglas, in *Roth* v. *United States*, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), wrote that '[n]o one would suggest that the First Amendment permits nudity in public places . . . .' *Id.* at 512, 77 S.Ct. at 1323, 1 L.Ed.2d at 1522 (Douglas, J., dissenting). The Supreme Court cited that statement in *Erznoznik* v. *City of Jacksonville*, 422 U.S. 205, 211 n. 7, 95 S.Ct. 2268, 2273 n. 7, 45 L.Ed.2d 125, 132 n. 7 (1975). [']Scenes of nudity in a movie, like pictures of nude persons in a book, must be considered as a part of the whole work . . . . In this respect such nudity is distinguishable from the kind of public nudity traditionally subject to indecent exposure statutes.['] " (*South Fla. Free Beaches* v. *City of Miami* (11th Cir. 1984) 734 F.2d 608, 610.)

Although *South Florida Free Beaches* involved the activity of nude sunbathing on a public beach, the same reasoning is persuasive as to Elysium's activities, which it characterizes as private recreational nudism. Accordingly, we do not consider Elysium's practice of nudism to be a form of speech protected by the federal or state constitutions. (See also *Tri-State Met. Naturists* v. *Lower Tp.* (1987) 219 N.J.Super 103 [529 A.2d 1047, 1051].)

II

## DEFINITION OF NUDIST CAMP

Relying on *City of Santa Barbara* v. *Adamson, supra,* 27 Cal.3d 123, appellants contend that the zoning regulation as to nudist camps should be struck down because the definition of nudist camp violates the right of privacy afforded by article I, section 1 of the California Constitution.[4]

---

[4]"All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." (Cal. Const., art. I, § 1.)

While respondents challenge Elysium's standing to raise the issue of whether the definition of nudist camp is vague or overbroad, overbreadth or vagueness is not the issue which is raised by applying *Adamson* here. The issue appellants raise here is whether the definition of nudist camp infringes on the constitutional right of privacy. We conclude that appellants have standing to raise this issue. Elysium is aggrieved by the application of the ordinance. (See *People* v. *Niebauer* (1989) 214 Cal.App.3d 1278, 1284, fn. 4 [263 Cal.Rptr. 287].) Moreover, inasmuch as a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties

According to the ordinance, "nudist camp" means "any place where three or more persons not all members of the same family congregate, assemble, associate or engage in any activity while without clothing or covering or with partial clothing or covering but with any pubic area or any portion of the crease of the buttocks exposed in the presence of others or of each other, other than an occasional gathering in, or on the premises of a private home. 'Nudist camp' includes growth center." (§ 22.08.140.)

"Family" is defined by the ordinance as "a person or persons related by blood, marriage or adoption living together as a single housekeeping unit in a dwelling unit. Family shall also include a group of not more than five persons, including roomers but not servants, unrelated by blood, marriage or adoption, when living together as a single housekeeping unit in a dwelling unit." (L. A. County Code, § 22.08.060.)

In *City of Santa Barbara* v. *Adamson, supra*, 27 Cal.3d 123, a substantially similar definition of "family" was incorporated into an ordinance which required that in the zone where Adamson lived with 11 other adults, all occupants of houses like that in which they reside be members of a family. The trial court granted the request of the City of Santa Barbara for a preliminary injunction and concluded that Adamson and the other residents of the house could not reside in the particular zone because they were not within the ordinance's definition of "family." The California Supreme Court reversed the order granting the preliminary injunction, recognizing that article I, section 1 of the California Constitution ensures "a right of privacy not only in one's family but also in one's home," (27 Cal.3d at p. 130), and that any incursion into individual privacy must be justified by a compelling public interest. (*Id.*, at p. 131.) The court impliedly answered "no" to the question it posed: "Has Santa Barbara demonstrated that, in fact, such an interest does underlie its decision to restrict communal living?" (*Ibid.*) In light of the privacy interest at stake and the lack of a compelling public interest to justify the distinctions drawn by the ordinance, the court held "invalid the distinction effected by the ordinance between (1) an individual or two or more persons related by blood, marriage, or adoption, and (2) groups of more than five other persons." (*Id.*, at p. 134.)

Although respondent argues that "there is no authority for the contention that California's more liberal privacy concept as enunciated in *Adamson*

not before the court (*Morris* v. *Municipal Court* (1982) 32 Cal.3d 553, 564, fn. 12 [186 Cal.Rptr. 494, 652 P.2d 51]), we conclude Elysium is entitled to challenge this ordinance by showing that it substantially abridges the state constitutional right of privacy of other parties not before the court.

extends to appellants' activities," respondent does not dispute the contention that the right of privacy under the California Constitution comprehends the right of three nudists, not members of the same family, to assemble together in a *home*. If "more than an occasional gathering," such activities inside a private home would bring that home within the definition of "nudist camp" under the instant ordinance!

The ordinance's stated purpose for the designation of certain zones is to "classify regularly and restrict the location of trades and industries and the location of buildings for special uses, and the use and area of premises for the general welfare of the county of Los Angeles." (L. A. County Code, § 22.12.010.) This language hardly provides the compelling public interest which would justify the ordinance's broad definition of nudist camp. Nor is such compelling interest shown in the ordinance's stated purpose underlying the establishment of agricultural zones "to permit a comprehensive range of agricultural use in areas particularly suited for agricultural activities," and that the area so zoned "may provide the land necessary to permit low-density single-family residential development, and outdoor recreational and needed public and institutional facilities." (L. A. County Code, § 22.24.010.)

Our record reveals no compelling interest to justify the inclusion of a private home within the definition of "nudist camp." We thus conclude that the definition of nudist camp in section 22.08.140 violates article I, section 1 of the California Constitution.

Even in the absence of a specific definition in the ordinance, it is without dispute in this case that Elysium is a nudist camp as the term is commonly understood. The elimination of the unconstitutional definition of nudist camp in the ordinance still leaves intact those provisions of the County Code which restrict nudist camps to the A-2 zone, provided a conditional use permit has been obtained, and which also render Elysium a nonconforming use which must be terminated after five years, unless that period is extended. Accordingly, we must now address appellants' contention challenging those latter portions of the ordinance pertaining to nudist camps as a denial of equal protection of the law.

### III

#### EQUAL PROTECTION

■ The guarantees of equal protection embodied in the Fourteenth Amendment of the United States Constitution and article I, section 7 of the

California Constitution compel recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. (*King* v. *McMahon* (1986) 186 Cal.App.3d 648, 656 [230 Cal.Rptr. 911].) ██ "In ordinary equal protection cases not involving suspect classifications or the alleged infringement of a fundamental interest, the classification is upheld if it bears a rational relationship to a legitimate state purpose." (*Weber* v. *City Council* (1973) 9 Cal.3d 950, 958-959 [109 Cal.Rptr. 553, 513 P.2d 601].) If the classification infringes upon a fundamental interest, the classification must be closely scrutinized and may be upheld only if it is necessary for the furtherance of a compelling state interest. (*Id.*, at p. 959.)

██ The fact that the right of privacy in one's home may comprehend the private practice of nudism does not compel a finding that the right to operate a nudist camp in a certain zone is a fundamental right. "Most zoning and land use ordinances affect population growth and density. . . . 'Were a court to . . . hold that an inferred right of any group to live wherever it chooses might not be abridged without some compelling state interest, the law of zoning would be literally turned upside down; presumptions of validity would become presumptions of invalidity and traditional police powers of a state would be severely circumscribed.' " (*Associated Home Builders Etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 603 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) Thus, "the premises upon which plaintiffs engage in business, even though utilized for the exercise of First Amendment rights, are subject to reasonable regulation under the police power." (*Antonello* v. *City of San Diego* (1971) 16 Cal.App.3d 161, 166 [93 Cal.Rptr. 820].)

Moreover, not every limitation or incidental burden on a fundamental right is subject to the strict scrutiny standard; when the regulation merely has an incidental effect on exercise of protected rights, strict scrutiny is not applied. (*King* v. *McMahon, supra*, 186 Cal.App.3d 648, 662.) We conclude that the operation of a nudist camp in any particular zone does not involve a fundamental right under equal protection analysis; to the extent that the ordinance affects a protected right of privacy, such effect is incidental, and strict scrutiny is not appropriate.

██ Under the traditional, rational relationship equal protection standard, what is required is that the court conduct a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals. (*Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 163 [211 Cal.Rptr. 368, 695 P.2d 665].) The County in its zoning ordinance "may not rely on a classification whose relationship to an asserted goal is so

attenuated as to render the distinction arbitrary or irrational." (See *Cleburne v. Cleburne Living Center, Inc.* (1985) 473 U.S. 432, 446 [87 L.Ed.2d 313, 324, 105 S.Ct. 3249].)

Under the terms of Los Angeles County Code (County Code) section 22.24.150, nudist camps are permitted in the heavy agricultural (A-2) zone provided a conditional use permit has first been obtained. Nudist camps are *not* permitted in the A-1 zone, and Elysium became a nonconforming use at its present location in the A-1 zone in 1971. A nonconforming use means "any use of land or property that was lawfully established . . . at the time the ordinance codified in Title 22, or any amendment thereto, became effective, but which, due to the application of this title or any amendment thereto is a use not listed as permitted, accessory, director's review, or subject to permit in the zone in which it is located." (§ 22.08.140.)[5]

As a nonconforming use beginning in 1971, Elysium was permitted to operate until 1976, when, pursuant to County Code section 22.56.1540, subdivision B, the nonconforming use was to terminate unless Elysium obtained permission to extend its period of operation. According to the

[5]The ordinance goes on to state that " 'Nonconforming use' shall also include: [¶] A. Uses reclassified from permitted to director's review or subject to permit in the same zone; and [¶] B. Uses made nonconforming by the addition of a development standard previously not required for such use in the same zoning classification, where such added standard is specified to be a condition of use."

Under subdivision B. of the ordinance, single-family residences in zone A-1 are subject to development standards in Section 22.20.105, and appear to fall within the definition of nonconforming use. Under subdivision A., campgrounds, colleges and universities, correctional institutions, hospitals, guest ranches, libraries, parks, playgrounds, riding academies, and recreation clubs are permitted in zone A-1 with a permit, and also appear to fall within the definition of nonconforming use.

This broad definition of nonconforming use appears to include those uses which are eligible to remain in the A-1 zone with a conditional use permit, but have not yet obtained one. Upon obtaining a conditional use permit, such use becomes a "conditional use" (County Code, § 22.56.010), and may remain in the A-1 zone. Respondents appear to concede that once a use permitted in zone A-1 has obtained a conditional use permit, such use is no longer nonconforming and may remain in that zone without being subject to amortization and termination. Thus, although certain recreational uses in the A-1 zone may be nonconforming for a period of time, such uses may obtain a permit, lose their status as nonconforming, and escape the amortization provisions. Nudist camps, on the other hand, are not a permitted use in zone A-1 and are subject to the provisions for amortization and termination of use. This difference in treatment under the ordinance constitutes the true distinction which we must examine under equal protection analysis.

The equal protection issue is to be distinguished from the issue of discriminatory enforcement, which appellants raised on their motion for new trial. Therein, appellants submitted evidence that the zoning ordinances were being discriminatorily enforced because the County after 1976 did not require all other preexisting recreational uses in the A-1 zone to obtain a conditional use permit in order to continue their uses. As explained below, we do not reach the discrimination issue.

Board's interpretation of section 22.56.1550, as set out in the revised findings, denial of an extension to continue a nonconforming use may be based solely on the finding that the applicant has not substantiated that to require cessation of such use would impair his property rights to such an extent as to be an unconstitutional taking of property. (§ 22.56.1550, subd. C.)

■■■ Appellants' equal protection argument is based on the claim that Elysium was required to terminate its use and is being forced to relocate to the A-2 zone, while uses similar to Elysium's, including recreational clubs, are permitted to remain in the A-1 zone provided they obtain a conditional use permit. Respondents acknowledge that as to these other uses permitted in zone A-1, if their "use is subsequently authorized by a [conditional use permit] the amortization schedule becomes irrelevant." In other words, certain uses which appellants claim are similar to their use of the property are allowed to apply for a conditional use permit and, if one is issued, those uses thereby remain in the A-1 zone (see *ante*, fn. 5), while nudists camps, whose investment in the property has been fully amortized (see *Castner* v. *City of Oakland* (1982) 129 Cal.App.3d 94, 96 [180 Cal.Rptr. 682]), are not allowed to remain even if they would meet the requirements for a conditional use permit.[6] Accordingly, our inquiry is directed to whether the termination of the use of property for nudist camps in zone A-1 bears a rational relationship to a conceivable legitimate state purpose. (*King* v. *McMahon, supra,* 186 Cal.App.3d 648, 663.) ■■■ "An ordinance, enacted under the police power, imposing burdens upon a class of persons does not violate the equal protection guarantee providing it applies equally to all persons within the class, and the classification is founded upon some natural, intrinsic or constitutional distinction which bears a rational relationship to the purpose the ordinance is intended to serve." (*Antonello* v. *City of San Diego, supra,* 16 Cal.App.3d 161, 167-168.)

As stated by the ordinance itself: "The agricultural zones are established to permit a comprehensive range of agricultural use in areas particularly

___

[6]County Code section 22.56.090 provides in pertinent part that a hearing officer shall approve an application for a conditional use permit where the information submitted by the applicant and/or presented at public hearing substantiates the following findings: "1. That the proposed use will be consistent with the adopted general plan for the area. . . . [¶] 2. That the requested use at the location proposed will not: a. Adversely affect the health, peace, comfort or welfare of persons residing or working in the surrounding area, or b. Be materially detrimental to the use, enjoyment or valuation of property of other persons located in the vicinity of the site, or c. Jeopardize, endanger or otherwise constitute a menace to the public health, safety or general welfare; and [¶] 3. That the proposed site is adequate in size and shape to accommodate the yards, walls, fences, parking . . . and other development features . . . ; and [¶] 4. That the proposed site is adequately served: a. By highways or streets of sufficient width and improved as necessary to carry the kind and quantity of traffic such use would generate, and b. By other public or private service facilities as are required."

suited for agricultural activities. Permitted uses are intended to encourage agricultural pursuits and such other uses required for, or desired by, the inhabitants of the community. An area so zoned may provide the land necessary to permit low-density single-family residential development, and outdoor recreational and needed public and institutional facilities." (County Code, § 22.24.010.)

Respondents argue that there are several rational bases for the restriction of nudist camps to the A-2 zone. First, they claim that the A-1 and A-2 zones are used differently in the County; that the "A-1 zone is used to designate confined neighborhoods in which residences are in close proximity to one another and in close proximity to any institutional or non-residential uses that may be present." Respondents claim that the A-1 zone "has been the basic residential zone in significant areas of the County," while the A-2 zone applies to areas which "are more remotely developed and where the topography does not confine development."

The express language of the ordinance itself contradicts respondents' argument with respect to the designated purpose of the zone. The agricultural zones were established to permit "outdoor recreational and needed public and institutional facilities."

Respondents also argue that the recreational uses "permited in the A-1 zone (with conditional use permit) are for the most part designed to serve the local neighborhood and/or are open in character (athletic fields, playgrounds)." However, it cannot fairly be said that health retreats, airports, youth camps, colleges and universities, convents and monasteries, correctional institutions, disability rehabilitation and training centers, juvenile halls, museums, riding academies and stables, and youth hostels are designed to serve the local neighborhood. Nor can the uses permitted in zone A-1 fairly be characterized as predominantly "open." While campgrounds and athletic fields are "open" in the sense that they are comprised of "open space," many other permitted uses are highly developed. If respondents' use of the term "open" means the property is accessible to public use, there are many uses the access to which is clearly restricted, including juvenile halls, correctional institutions, and convents and monasteries. Public access would also be restricted to the private youth camps and private recreation clubs.

Respondents claim that nudist camps must be a closed recreational facility whose boundaries are clearly defined, in order to protect the privacy of both the nudists and the surrounding neighbors. However, this aspect of the use of the property poses the same issue for correctional institutions, convents and

monasteries, juvenile halls, and youth camps, all of which uses require some element of isolation for the benefit of the users and the surrounding neighbors. Without merit is respondents' claim that nudist camps can be distinguished from other recreational uses by their hours of operation, as Elysium frequently operates during the evening hours when other recreational uses are precluded. Expressly permitted in zone A-1 (with a conditional use permit) are overnight camping facilities, colleges and universities, guest ranches, health retreats, and tennnis, polo and swimming clubs, including pro shops, restaurants, and bars as appurtenant uses. Such uses expressly contemplate evening uses.

Finally, respondents argue that nudist camps attract curiosity seekers and voyeurs, and also present an "attractive nuisance" for children in the area, unlike the permitted uses in the zone. To the extent that the concern expressed here relates to the reactions of others to the *activities* at Elysium, which activities may involve the exercise of its members' constitutional rights of association and privacy, we do not deem this concern to be within the express purpose of the zoning classifications set up in the ordinance, nor does it properly fall within the type of "secondary effects" which may be sought to be prevented through enactment of zoning regulations.

The concept of "secondary effects" was explained in *Renton* v. *Playtime Theatres, Inc.* (1986) 475 U.S. 41 [89 L.Ed.2d 29, 106 S.Ct. 925], wherein the court upheld a zoning ordinance prohibiting the location of adult motion picure theaters within 1,000 feet of any residential zone, church, park, or school: "[T]he city's pursuit of its zoning interests here was unrelated to the suppression of free expression. The ordinance by its terms is designed to prevent crime, protect the city's retail trade, maintain property values, and generally 'protec[t] and preserv[e] the quality of [the city's] neighborhoods, commercial districts, and the quality of urban life,' not to suppress the expression of unpopular views." (*Id.*, at p. 48 [89 L.Ed.2d at p. 38, 106 S.Ct. 925].) It is the secondary effect which these zoning ordinances attempt to avoid, not the dissemination of offensive speech. (*Id.*, at p. 49 [89 L.Ed.2d at p. 39, 106 S.Ct. 925].)

However, "while the regulation in *Renton* applied only to a particular category of speech, its justification had nothing to do with that speech. . . . Instead, the ordinance was aimed at the '*secondary effects* of such theaters in the surrounding community,' . . . . [¶] Regulations that focus on the direct impact of speech on its audience present a different situation. Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*." (*Boos* v. *Barry* (1988) 485 U.S. 312, 320-321 [99 L.Ed.2d 333, 344,

108 S.Ct. 1157], original italics; see also *Sebago, Inc.* v. *City of Alameda* (1989) 211 Cal.App.3d 1372, 1384 [259 Cal.Rptr. 918].)

Although this case does not involve the issue of constitutionally protected speech, respondents' attempt to justify the distinction between nudist camps and other recreational uses in zone A-1 on the ground of its attraction to children and voyeurs does focus on conduct that may involve the exercise of constitutional rights of association and privacy. Accordingly, this ground alone cannot be said to constitute a "constitutional distinction which bears a rational relationship to the purpose the ordinance is intended to serve." (*Antonello* v. *City of San Diego, supra,* 16 Cal.App.3d at pp. 167-168.)

Respondents also maintain that the "motley throng" of curiosity seekers and voyeurs, as well as the members' use of Elysium, causes a secondary effect of intrusive traffic in the surrounding residential neighborhood. However, this "secondary effect" of nudist camps that may distinguish such use of property from other recreational uses cannot, under this particular ordinance, justify the different treatment of nudist camps. This is so because the ordinance already subjects all similar uses to a conditional use permit procedure in which the County can consider, as factors in granting or denying a permit, whether the site is adequately served by highways or streets sufficient to carry the kind and quantity of traffic such use would generate, and whether the use would adversely affect the health, peace, comfort or welfare of persons residing in the surrounding area. (County Code, § 22.56.090, *ante,* fn. 6.)

Given the ability of the County to regulate, through the conditional use permit procedure, the location of other recreational uses that may pose similar parking or traffic problems in the surrounding neighborhoods in the A-1 zone, the distinction between nudist camps and recreational clubs bears no rational relationship to a conceivable legitimate purpose. Thus, that part of the ordinance relegating nudist camps to the A-2 zone is unconstitutional as applied to Elysium's property. In light of this conclusion, we need not address appellants' claims that the portion of the ordinance restricting nudist camps to the A-2 zone constitutes an unconstitutional taking of property.

The conclusion that the ordinance's restriction of nudist camps to the A-2 zone constitutes a denial of equal protection as to Elysium's property is not the end of the inquiry in the instant case. A "reviewing court properly may correct a discriminatory classification by invalidating only the invidious exception or exemption and thus extend statutory benefits to those

whom the Legislature improperly excluded." (*In re Kapperman* (1974) 11 Cal.3d 542, 550 [114 Cal.Rptr. 97, 522 P.2d 657].)

In the instant case, respondents also proceeded in disregard of the classification restricting nudist camps to the A-2 zone and treated Elysium as if it were permitted, subject to conditional use permit, in the A-1 zone. Had respondents treated Elysium as a nonconforming use restricted only to zone A-2, respondents' only inquiry, according to their own interpretation of the ordinance's amortization provisions, would have been whether cessation of use would impair Elysium's property rights so as to constitute an unconstitutional taking of property. (§ 22.56.1550, subd. C.1.) However, respondents made further findings under County Code sections 22.56.040 and 22.56.090, which set out criteria governing the issuance of conditional use permits.[7]

 Pursuant to our authority to correct a discriminatory classification and to consider the validity of the remainder of the ordinance, we must now address appellants' contentions pertaining to the validity of the standards governing the issuance of conditional use permits. This issue is not speculative, as appellants claim, because it is clear that respondents in essence deemed Elysium to be a use permitted in zone A-1 subject to a conditional use permit, and proceeded to apply the relevant provisions of the ordinance to Elysium.

It is apparent from our record that appellants failed to object to the Board's consideration of issues and criteria pertaining to the issuance of a conditional use permit and *even now* do not claim that the County's findings on this issue are not supported by substantial evidence or that the procedure employed by County deprived them of the opportunity to raise constitutional

---

[7]Some of the Board's revised findings responsive to the factors in County Code sections 22.56.040 and 22.56.090 (*ante*, fn. 6) include: "20. The activities being conducted by [Elysium] adjacent to residential properties reduce the value of those residential properties not involved in such usage. . . . [¶] 29 . . . [Robinson Road's] paved width varies from about 22 feet down to 12 feet. . . . The narrowness of [Robinson Road] is exacerbated by the steep to rolling vertical alignment and blind curves at points along its route. Comparable commercial densities currently require 40 feet roadways. [¶] 30. Given the high fire hazard in the area and the fact that this fire hazard is at its greatest during the summer months when patronage at the institute is at its peak, the lack of adequate emergency access to the institute is a hazard. . . . [¶] 32. Road widening and other safety construction to accommodate the commercial activities of the institute may negatively affect nearby property. . . . [¶] 36. The intersection of Robinson Road at Topanga Canyon Boulevard is also unsafe for the traffic volume generated by the institute. [¶] 38. Activities occur on site that are noise generators. . . . [¶] 39. The noise creates adverse impact both on the neighboring residents and the rural character of the neighborhood. [¶] 40. Use of the existing and inadequate septic system to support the institute's commercial land use may be a health hazard to the community."

challenges to the conditional use permit ordinances. What County did in essense was to deem Elysium a permitted use in zone A-1 and the procedure to be one for a conditional use permit. County denied such a permit.

Contrary to assertions in the dissent, we do not speculate. Appellants were in fact denied a conditional use permit by the Board and appellants have not been foreclosed from challenging such denial. In fact, they challenged the conditional use permit ordinance in the trial court and do so here on several grounds. (See following discussion in pt. IV herein.) It is thus clear that appellants had every opportunity before trial to raise issues pertaining to the conditional use permit procedures. On this record, we find the County proceeded properly by deeming Elysium a permitted use in the A-1 zone and then by considering the criteria for issuance of a conditional use permit. In light of the proceedings herein, we proceed to address appellants' challenges to the conditional use permit standards.

## IV

### CONDITIONAL USE PERMIT STANDARDS

■ Appellants' challenges to County Code sections 22.56.040 and 22.56.090 as void for vagueness and as overbroad are without merit. Appellants cite cases dealing with licensing regulations involving the exercise of the right of freedom of expression, which right is not at issue herein. The authorities cited by appellants fail to support the claim that the standards for issuance of a conditional use permit, as applied to Elysium, are impermissibly vague or overbroad.

Moreover, the standards for a conditional use permit set out in the ordinance do not purport to operate as to matters that may be constitutionally protected, such as the rights of association or privacy. For similar reasons we also find without merit appellants' contention that the conditional use permit procedure constitutes an impermissible prior restraint. This case does not involve the prior restraint of protected speech.

■ To the extent that appellants challenge the conditional use permit procedure which respondents implicitly applied in the instant case as constituting an unconstitutional taking of property, we find such challenge to be without merit.[8] We note that appellants appear to have addressed the

---

[8]We disagree with appellants' claim that the trial court's statement of decision fails to address the issue of whether the conditional use permit regulations as to recreational uses in the A-1 zone constitute an unconstitutional "taking." Paragraph 12 of the statement of

"takings" issue in the context of the validity of the restriction of nudist camps to the A-2 zone. It is important to recognize that we address this issue *not* in the context of that portion of the zoning ordinance restricting nudist camps to the A-2 zone, which provision we have concluded violates equal protection of the law, but in the context of the provisions relating to uses permitted in the A-1 zone with a conditional use permit, which classification we have corrected to include nudist camps. Thus, at issue herein are the conditional use permit provisions for recreational uses in the A-1 zone, including those provisions which would apply in the event a permit is denied, rendering the use nonconforming and thus subject to the amortization provisions of section 22.56.1550.

We find without merit the claim that the conditional use permit provisions for uses permitted in the A-1 zone effect a confiscatory taking. Land-use regulation does not effect a taking if it substantially advances legitimate state interests and does not deny an owner economically viable use of his land. (*Nollan* v. *California Coastal Comm'n, supra,* 483 U.S. 825, 834 [97 L.Ed.2d 677, 687, 107 S.Ct. 3141].) The government's regulation must substantially advance the precise state interest which avowedly motivates the regulation. (*First English Evangelical Lutheran Church* v. *County of Los Angeles* (1989) 210 Cal.App.3d 1353, 1365 [258 Cal.Rptr. 893].)

"Ordinarily a zoning ordinance permits certain uses for an area but provides that other uses may be permitted after consideration by a governmental agency as to whether the proposed other use will be in the best interests of public convenience and necessity and not contrary to the public welfare. [Citations.] A conditional use permit, unlike a nonconforming use, allows a use permitted rather than proscribed by the zoning regulations, but because of the possibility that the permitted use could be incompatible in some respects with the applicable zoning, a special permit is required." (*Sports Arenas Properties, Inc.* v. *City of San Diego* (1985) 40 Cal.3d 808, 814-815 [221 Cal.Rptr. 538, 710 P.2d 338].)

Under the instant ordinance, a conditional use "means a use which because of characteristics peculiar to it, or because of size . . . or because of its location with reference to surroundings, street or highway width, traffic generation or other demands on public services, requires special consideration relative to placement at specific locations in the zone or zones where

decision notes that Elysium "would not have been able to comply with the requirement of obtaining a conditional use permit, which was *validly imposed on recreational uses in the A-1 zone.*" (Italics added.) To the extent that the failure of the trial court to refer specifically to the takings issue in this context constitutes an irregularity, such irregularity is nonprejudicial and does not require redress on our part. (*Ante,* fn. 2.)

classified to insure proper integration with other existing or permitted uses in the same zone or zones." (County Code, § 22.56.010.)

 Appellants fail to establish that the integration of various uses within a particular zone does not constitute a legitimate interest, bearing a reasonable relation to the public welfare. (See *Associated Home Builders, Etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 604-605 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) Appellants also fail to show that the criteria governing the issuance of conditional use permits in County Code sections 22.56.040 and 22.56.090 do not substantially advance that precise purposes of conditional use permits as avowed in County Code section 22.56.010. Under the provisions of the instant ordinance, if a conditional use permit is denied to a use permitted in the A-1 zone only with a conditional use permit, the use of the property becomes nonconforming and the amortization provisions may apply. (*Ante*, fn. 5.)

California cases have firmly held zoning legislation may validly provide for the eventual termination of nonconforming property uses without compensation if it provides a reasonable amortization period commensurate with the investment involved. (*Castner* v. *City of Oakland, supra*, 129 Cal.App.3d 94, 96.)

We also note that appellants do not argue the issue of whether the conditional use permit provisions deny them economically viable use of the land; nor do they challenge the Board's revised findings that there was no substantial evidence to show that the property could not revert to single-family residential uses and that residential lots of one acre in the area are desirable in the current real estate market.

We conclude appellants' challenges to the validity of the conditional use permit provisions of the ordinance to be without merit.

V

SUFFICIENCY OF EVIDENCE AND MOTION FOR NEW TRIAL

 Appellants contend that there was insufficient evidence to support paragraph 8 of the court's statement of decision wherein the trial court found that the ordinance's five-year amortization schedule for Elysium's use was reasonable and that Elysium's investment has been properly

amortized.[9] Appellants fault the County for failing to introduce any evidence to support this finding.

Appellants misconceive the burden of proof before the administrative agency. Under the provisions of both County Code sections 22.56.040 (application for a conditional use permit) and 22.56.1550, subdivision C. (application to extend time within which a nonconforming use must be discontinued), Elysium had the burden of proof to substantiate certain findings in their favor. The Board determined that Elysium did not carry that burden, and the trial court determined that the Board's findings are supported by the evidence. Even now, appellants fail to point to any evidence in the record which is contrary to the Board's findings. Accordingly, their contention as to the sufficiency of evidence as to the findings in paragraph 8 of the statement of decision is without merit. Also without merit is appellants' claim that the trial court erroneously failed to grant the motion for new trial on the ground of insufficiency of the evidence.

■■■ Appellants also challenge the sufficiency of the evidence to support language in paragraph 4 of the statement of decision.[10] Appellants interpret that paragraph as the court's attempt to deal with the factual issue of discriminatory enforcement of the conditional use permit requirement for recreational uses in the A-1 zone, and then claim that there was insufficient evidence to support that finding. The contention is absurd. First, the issue was not raised in the pleadings and was not a material issue before the court when it rendered the statement of decision. Appellants' opening brief admits that "The County's argument that Elysium was not singled out in the enforcement of the [conditional use permit] requirement because all recreational uses in Zone A-1 were required to obtain a [conditional use permit], arose for the first time *after* the trial of this matter . . . ." (Original italics.)

---

[9]Although as to this issue the trial court purported to exercise its independent judgment in weighing the evidence of amortization before the agency, we do not intend to imply that this is the correct standard of review in the trial court. "To date, only four appellate decisions have held that a property owner had a 'fundamental vested right' in a land use matter. Each case involved classic vested rights and estoppel principles. [Citations.] No case has yet held, in the granting or denial of an application for variance or conditional use permit, that the decision affected a 'fundamental vested right.' In fact, the vast majority of cases considering an allegation of fundamental vested right requiring exercise of independent judgment have rejected it." (*Smith* v. *County of Los Angeles* (1989) 211 Cal.App.3d 188, 199 [259 Cal.Rptr. 231].)

[10]Paragraph 4 states: "As a result of the above-described zoning ordinance amendment, all existing recreational uses in the A-1 zone . . . became legal, nonconforming uses on the effective date of the amendment. Under the terms of the zoning ordinance, such nonconforming uses could continue for five years before they were required to comply with the new requirements imposed by the amendment. Within five years all existing recreational uses in the A-1 zone (with the exception of Petitioners') were required to obtain a [conditional use permit]."

Second, it is clear from our record that the trial court in paragraph 4 of the statement of decision was simply interpreting the terms of the ordinance; the court was not attempting thereby to address the issue of discriminatory enforcement, which was not raised by the pleadings.

 Appellants finally contend that the trial court erred in failing to grant the motion for new trial on the basis of newly discovered evidence pertaining to the issue of discriminatory enforcement. In support of the motion for new trial, Elysium submitted the declaration of Peter Wartman, a zoning consultant in Los Angeles County, who declared that "there has been no systematic County-wide policy or procedure by which each and every recreational use which was in existence before November 1971 was notified that to continue its use after November 1976, a conditional use permit was required or by which such recreational uses were systematically terminated after November 1976 in the absence of a conditional use permit. On the contrary . . . recreational uses are subjected to conditional use permits requirements, if at all, only on a case-by-case basis if such uses come to the attention of the County for some other reason."

 A motion for a new trial on the grounds of newly discovered evidence is within the discretion of the trial court and will not be disturbed on appeal unless a clear abuse of discretion is shown. (*White* v. *Dorfman* (1981) 116 Cal.App.3d 892, 899 [172 Cal.Rptr. 326].) "The essential elements that must be established by appellants are: (1) that the evidence is newly discovered, (2) that reasonable diligence has been exercised in its discovery and production, and (3) that the evidence is material to the movant's case." (*Ibid.*)

 As the new evidence did not relate to any issue raised by the pleadings, appellants fail to establish that the new evidence was material to their case. Accordingly, they fail to show the trial court abused its discretion. Moreoever, the trial court could have reasonably concluded that the newly discovered evidence showed only that the County may have been lax in the enforcement of the ordinance, which is insufficient to show any intentionally discriminatory enforcement.

"[I]n *Wade* v. *City & County of San Francisco* (1947) 82 Cal.App.2d 337 [186 P.2d 181] . . . , the court pointed out 'that mere lax enforcement of a law or ordinance violates no constitutional rights' . . . and there must be proved, an enforcement against the plaintiff which is intentionally discriminatory." (*City Etc. of San Francisco* v. *Burton* (1962) 201 Cal.App.2d 749, 755 [20 Cal.Rptr. 378].) The court in *Burton* continued: "Assuming the city had 'permitted' others to violate the ordinance, mere inaction is not

necessarily the result of an intentional or arbitrary scheme to discriminate against defendants. Without more the city may not be precluded from enforcing the ordinance against defendants." (*Ibid.*)

Under the facts of this case, it was Elysium which instituted the proceedings by filing an application to extend the time to continue its nonconforming use. Although Elysium did not argue the constitutionality of restricting nudist camps to the A-2 zone before respondents, respondents proceeded in a manner as if such aspect of the ordinance, which we determine to be unconstitutional, were not applicable. Respondents in essence treated Elysium as any other recreational use permitted in the A-1 zone with a conditional use permit. Respondents, apparently without any objection by Elysium, considered the criteria applicable to the grant or denial of a conditional use permit, and made findings thereon. In light of the proceedings herein, it is difficult to conceive how a claim of discriminatory enforcement could succeed.

In conclusion, we hold that while appellants are entitled to a declaration that County Code sections 22.08.140 (definition of nudist camp) and 22.24.150 (restricting nudist camps to the A-2 zone) are unconstitutional as applied to their property, the judgment in the administrative mandamus proceeding upholding the decision of the Board must be affirmed.

### DISPOSITION

The judgment is modified to include the declaration that County Code sections 22.08.140 and 22.24.150 are unconstitutional as applied to appellants' property herein; in all other respects the judgment is affirmed.

Woods (Fred), J., concurred.

**JOHNSON, J.,** Concurring and Dissenting.—I concur in the majority opinion insofar as it finds the county unconstitutionally barred Elysium from zone A-1. However, I dissent from its speculative conclusion Elysium probably "would" have been denied a conditional use permit (CUP) had its application been considered as a permitted use in zone A-1. Indeed, what we have here is speculation on top of speculation on top of speculation. It is mere speculation Elysium would have been required to apply for a CUP if it had been considered a permitted use. If a CUP could have and would have been required, it is mere speculation the county would have denied Elysium that CUP. Furthermore, it is mere speculation the county's decisions to require and to deny a CUP to Elysium could have withstood a challenge based on discriminatory treatment of a constitutionally protected activity

involving freedom of association.[1] The proper disposition of this case is to reverse and allow Elysium to be considered as a permitted use in zone A-1 with whatever consequences that might have in the future under the conditional use permit process. What the trial court did and the majority opinion approves indeed places Elysium in a classic Catch-22.

## I. THE JUDGMENT SHOULD BE REVERSED IN ITS ENTIRETY AS SPECULATIVE AND UNSUPPORTED BY THE EVIDENCE.

The outstanding and unresolved issue before this court is how the unconstitutional reclassification and banishment of the nudist colony to zone A-2 affects its subsequent classification status within zone A-1.

Under the terms of Los Angeles County Code section 22.08.140 a nonconforming use means "any use of land or property . . . which due to the application of this title or any amendment is a use *not* listed as permitted, accessory, director's review, or subject to permit in the zone it which it is located." (Italics added.) Under the majority opinion this broad definition includes uses subject to a CUP. Recreational uses under the new ordinance are a permitted use with an approved CUP (L.A. County Ord. No. 10,366.) and appellant's use of its property as a nudist colony is a recreational use. Hence, appellant is a permitted use subject to a CUP and not merely a nonconforming use seeking "grace" from the county to remain in Zone A-1. This distinction is significant because no longer can the issues, arguments, and findings within the legal nonconforming use framework apply when considering a CUP or a permitted use in that zone.

It is one thing to make a finding the board of supervisors (Board) denied the nudist colony the "grace" of remaining as a nonconforming use within a zone where it didn't belong. It is quite another to infer from that fact a finding the Board would have *required and denied* a CUP to an entity which was engaging in a *preexisting conforming* use within that zone.

---

[1] One of the unfortunate effects of the majority's opinion is to deny Elysium the opportunity to raise a constitutional challenge to the hypothetical denial of the hypothetical CUP. Elysium would have grounds for challenging the requirement and denial of a CUP which are different from its challenge to the denial of its application for extension as a nonconforming use. Inexplicably, the trial court even refused Elysium's tender of expert testimony which would have tended to support claims of discriminatory treatment by demonstrating other permitted recreational users in the A-1 zone are not required to submit CUP's. This evidence was hastily assembled when it became apparent after trial the court was considering the unique approach of speculating about what the county would have done with a hypothetical CUP application. Thus, it is merely speculative of what a full-fledged constitutional challenge to such a CUP denial might look like were Elysium allowed to present one. The trial court's rejection of this evidence and the majority's affirmance of that decision complete the Catch-22.

There are two alternative classifications applicable under Los Angeles Ordinance No. 10,366: either appellant rebounds from its misclassification as a legal nonconforming use to its permitted land-use status prior to the 1971 amendments or to a conditional land-use status pursuant to the 1971 amendments. Under either alternative, appellant is classified as a *permitted* use as opposed to a legal nonconforming use.

A. *As a Preexisting Permitted Use Elysium Was Not Required to Obtain a CUP.*

If appellant was classified according to its pre-1971 status, then no CUP would be required. It is a fundamental principle of zoning law that a use which predates the enactment of a zoning ordinance can be continued without obtaining a conditional use permit although one is required for later uses. (Hagman et al., California Zoning Practice (Cont.Ed.Bar 1969) § 9.19, pp. 393-394.)

Appellant was established at its present location in 1968, several years before the enactment of the ordinance in 1971. As of 1970, the Los Angeles County Counsel classified appellant as a *permitted* recreational use in zone A-1. Therefore, when the ordinance was enacted all existing recreational uses, including appellant, were exempt from any duty to apply for a CUP. Appellant only became a legal nonconforming use in zone A-1 by virtue of county code sections 22.08.140 and 22.24.150, both of which were found unconstitutional by the majority opinion in this case. Therefore, since these sections were stricken as unconstitutional the classification of appellant as a legal nonconforming use must also be disregarded. Consequently, appellant never lost its permitted use status, and does not need to apply for a CUP in order to continue its existence in zone A-1.

B. *Even If a CUP Could Be Required It Was Error to Assume It Would Be Required and to Foreclose a Constitutional Challenge if It Were Required.*

If appellant rebounded to a permitted use subject to an approved CUP, then it would be subject to the *possibility* it would be required to apply for a CUP. This does not mean, however, that the county inevitably would have subjected Elysium to this requirement. The evidence the trial court improperly excluded embraced expert testimony the county in fact did not require CUP's from most, if not all recreational use landowners in zone A-1. If that is the pattern it is entirely possible the county would have allowed Elysium to continue its now permitted A-1 use without requiring a CUP. In any event,

it was not for the trial court to assume the county *would* require a CUP merely because it *could*.

Even if Elysium in fact were required to submit a CUP application, as the majority speculates it would, then appellant could argue this requirement was not uniformly enforced. Assuming the ordinance contained such a legal requirement, if in practice that requirement was not uniformly enforced against other recreational users then Elysium would have a valid constitutional argument it was singled out for impermissibly discriminatory treatment. (*Snowden* v. *Hughes* (1944) 321 U.S. 1, 8 [88 L.Ed. 497, 502-503, 64 S.Ct. 397]; *Murgia* v. *Municipal Court* (1975) 15 Cal.3d 286, 297-230 [124 Cal.Rptr. 204, 540 P.2d 44].)

C. *Even If a CUP Were Required It Was Error to Assume It Would Be Denied and to Foreclose a Constitutional Challenge if It Were Denied.*

Assuming a CUP were required and that requirement passed constitutional muster, it is by no means self-evident the county would deny that CUP. It is true Elysium stipulated the *requirements* for extending a legal nonconforming use and obtaining a CUP are basically identical. That does not mean the burdens and the presumptions about continuing existence are the same. Whether the county grants an application for extension of a nonconforming use is very much a matter of "grace." Not so the decision whether to grant a conditional use permit for a permitted use, especially when a landowner was using the property for that purpose at the time the CUP requirement was imposed on the zone. It is presumed a nonconforming use will be amortized over time and eventually eliminated. In contrast, it is presumed a preexisting permitted use will continue to exist indefinitely, perhaps with some conditions designed to minimize adverse impacts on adjoining landowners. Elysium never had the opportunity to apply for a CUP and argue the merits under this framework.

If the county did deny Elysium a CUP outright Elysium would have a further opportunity to mount a constitutional challenge, an opportunity it is unconstitutionally denied by the majority's affirmance of a hypothetical denial of a hypothetical CUP application. This constitutional challenge could be predicated on a claim the county discriminated against the nudist camp use by denying Elysium a CUP in circumstances where other uses have been granted CUP's. This would qualify as unconstitutional discrimination for the same reason as requiring a CUP of Elysium but not of other recreational uses in the A-1 zone. It singles out this constitutionally protected use implicating

the right of freedom of assembly for discriminatory treatment. (*Snowden* v. *Hughes, supra*, 321 U.S. 1; *Murgia v. Municipal Court, supra*, 15 Cal.3d 286.) Furthermore, since Elysium's use of this property as a nudist camp predates the CUP requirement, outright denial of a CUP could well support an action for a "regulatory taking." (*Nollan* v. *California Coastal Commission* (1987) 483 U.S. 825 [97 L.Ed.2d 677]; *First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378].)

I admit I am only speculating Elysium would have factual grounds for a constitutional challenge predicated on discriminatory denial of its CUP application. But the trial court and the majority opinion are speculating, too, if they are purporting to make the constitutionally required finding that such a challenge is doomed to failure. No evidence was submitted at the trial below to support (or refute) such a contention, *because no CUP application had been filed or denied.* It was irrelevant whether the county had granted CUP applications for *permitted* recreational uses in the A-1 zone under circumstances analogous to Elysium's situation for the simple reason Elysium was not applying for a CUP. It was applying for an extension as a nonconforming use. As such it was in a different, legitimately inferior classification—so long as that classification remained constitutional. Thus, until our court declared Elysium could no longer be considered as a nonconforming use, it was in no position to claim it was denied equal protection of the law in comparison with other permitted A-1 uses applying for CUP's in that zone. Until our decision Elysium was playing in a different ball game and could not complain it was being treated unfairly in the CUP game. It had no reason to submit evidence about the fairness of the CUP game in the trial court and will not have reason to do so unless and until it plays that game and loses.

## II. Trial Court Erred in Failing to Make Findings on Material Issues.

Code of Civil Procedure section 632 requires a trial court to issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues. The court must make findings that are definite and certain, on all material issues. (*Estate of McAfee* (1960) 182 Cal.App.2d 553, 556 [6 Cal.Rptr. 79].)

As the majority finds, the issue of discriminatory treatment was not raised until after the trial. However, as pointed out above, discriminatory treatment in the *grant or denial of CUP's* did not became an issue until after the trial. Moreover, a constitutional issue may be raised for the first time ever on appeal. (*Hale* v. *Morgan* (1978) 22 Cal. 3d 388, 394 [149 Cal.Rptr. 375, 584

P.2d 512]; *People* v. *Allen* (1974) 41 Cal.App.3d 196, 201 [115 Cal.Rptr. 839]; *People* v. *Norwood* (1972) 26 Cal.App.3d 148, 152-153 [103 Cal.Rptr. 7]; *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 5 [97 Cal.Rptr. 431].)

In the instant case, the trial court committed reversible error in failing to resolve the issue whether appellant was unconstitutionally singled out by the county's discriminatory enforcement of the ordinance. The majority found the evidence of appellant's consultant as immaterial because it did not relate to any issue raised by the pleadings. Thus the issue was never reviewed or resolved.

Insufficient evidence is a ground for reversing a trial court's decision (*Krause* v. *Apodaca* (1960) 186 Cal.App.2d 413 [9 Cal.Rptr. 10], as well as a ground for granting a new trial. (Code Civ. Proc., § 657, subd. 6.) Even if we were to assume that all preexisting recreational uses were required to obtain a CUP to continue to operate in zone A-1, and none were granted a CUP, no evidence was presented to support this contention. In fact no other recreational landowner *uses* were mentioned in the record to say nothing of whether they subsequently applied for and were granted or denied a CUP.

It is significant and revealing the parties devoted only a page each in their lengthy briefs to the grounds on which the majority pins its affirmance in this case. This apparently was not viewed by either party as a serious argument for sustaining the trial court's judgment. It is evident from the record the trial court's speculations about what would have happened in the CUP process had Elysium filed a CUP application was very much an afterthought. The trial itself focussed on the constitutionality of consigning the nudist camp use to the A-2 zone and retaining it in A-1 solely as a matter of "grace" in the status of a nonconforming use. Only after the trial was over and the evidence phase ended did the trial court indicate it was considering an alternative ground—a finding the county "would" have denied Elysium a CUP and thereby terminated its continued existence in the A-1 zone even if "nudist camps" were a permitted use in that zone. Having belatedly introduced this issue, the court then denied Elysium's attempt to introduce at least some evidence bearing on the constitutionality of such CUP denial if it were to have happened.

The trial court and the majority in this court cannot have it both ways. They cannot predicate the judgment on a ground not considered at trial and then deny a party the opportunity to introduce new evidence bearing on the constitutionality of that ground.

## III. CONCLUSION

If a witness at trial attempted to engage in even one of the several levels of speculation the trial court and majority opinion resort to in this case, that witness would not get the first words out of his or her mouth before an objection was sustained. "Speculative, conjectural, that kind of guessing has no place in our courts." And if the witness persisted in this line of testimony he or she would soon face a sharp admonishment from the trial judge for attempting to "speculate about what other people would have done if things had been different than they were."

This kind of speculation has no more place as the basis of a trial court's decision or an appellate opinion than it does in a witness' testimony. The reasons the law looks to evidence and what actually happened rather than to speculation and what "would" have happened if the situation were different are dramatically illustrated by the instant case. When judges stray from the straight and narrow path of fact they often wander into a mine field of conjecture—with predictable consequences. Every speculation is based on one or more assumptions, some of which may remain concealed from the speculator. These assumptions, in turn, typically rest on further assumptions, even more likely to be overlooked by the speculator.

The trial judge here indulged in what he viewed as a single, simple speculation—what the Board would have done if Elysium had submitted a CUP application instead of a request for an extension to continue as a nonconforming use. The judge assumed that since the same criteria apply in both decisions the result would be the same. This ignores the fact—or assumes away—that other circumstances would be different including and especially Elysium's status as a preexisting permitted use rather than a nonconforming use within the A-1 zone. Thus, as we have seen, the trial judge's simple speculation cannot be made without speculating about a series of other assumptions on which it rests. This speculation makes no sense at all unless:

(1) We assume that were nudist camps a *preexisting* permitted use within the A-1 zone the county could under its current rules lawfully require a CUP.

(2) If it could require a CUP, we assume the county has a practice of requiring CUP's from landowners in the A-1 zone which engage in *preexisting* permitted recreational uses.

(3) If it has such a practice, we assume it actually decides to require Elysium to obtain a CUP for its *preexisting* permitted recreational use.

(4) If it decides to require a CUP, we assume it has a practice of *denying* CUP's to other *preexisting* permitted recreational uses for the reasons it denied Elysium its request to remain as a nonconforming use, instead of imposing conditions on those other landowners to mitigate any adverse impacts.

(5) If it has such a practice, we assume it actually decides to deny a CUP to Elysium for its *preexisting* permitted recreational use.

(6) If the Board denies Elysium's CUP application, we assume Elysium would not be able to demonstrate discriminatory treatment in the decision to require a CUP or in the denial of that CUP.

This is a healthy set of assumptions. None of them find any support in the record. Nor can any of them be satisfied without indulging in still further speculations which find no support in the record. Indeed, some of these assumptions are drawn into serious question by what the trial court improperly excluded from the record—evidence the county does not ordinarily require CUP's of landowners engaged in uses in the same basic category as Elysium's use of its property.

It is bad enough the trial court's judgment, as affirmed by the majority in this court, rests almost entirely on hypothetical speculation rather than historical fact. But this vice acquires a constitutional dimension because it deprives Elysium of its constitutional right to assert a constitutional challenge to what might have been an unconstitutional decision by the Board if that decision had been made. If this last sentence sounds as if we have entered "never-never" land, that is because we have. In my view, we should return to the real world. If we did, the decision below would have to be reversed.

Appellants' petition for review by the Supreme Court was denied October 3, 1991.