[L.A. No. 31987. Dec. 31, 1985.]

SPORTS ARENAS PROPERTIES, INC., et al.,
Plaintiffs, Cross-defendants and Appellants, v.
CITY OF SAN DIEGO et al.,
Defendants, Cross-complainants and Respondents;
UNIVERSITY CITY VILLAGE TENANTS ASSOCIATION et al.,
Interveners and Respondents.

810

## COUNSEL

Bruce A. Ray and Baxley, Mautino & Ray for Plaintiffs, Cross-defendants and Appellants.

John W. Witt, City Attorney, Ronald L. Johnson, Senior Chief Deputy City Attorney, C. Alan Sumption, Chief Deputy City Attorney, Kenneth So and Nina B. Deane, Deputy City Attorneys, for Defendants, Cross-complainants and Respondents.

D. Dwight Worden and W. Scott Williams for Interveners and Respondents.

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, N. Gregory Taylor, Assistant Attorney General, Steven H. Kaufmann, Deputy Attorney General, Natalie E. West, City Attorney (Berkeley), and Richard J. Wharton as Amici Curiae on behalf of Defendants, Cross-complainants and Respondents and Interveners and Respondents.

## OPINION

**BROUSSARD, J.**—Plaintiffs appeal from a judgment enjoining them from renting their apartments except to senior citizens on a nonprofit basis.[1] We conclude that the injunction must be vacated because the trial court misinterpreted the conditional use permit pursuant to which the project was to be built.

In March 1962, the Foundation for Specialized Group Housing applied to the City of San Diego "to construct and operate a non-profit senior citizen housing project under the requirements specified in the Federal Housing Act, Title II, Section 231. The project will consist of 549 apartment units in 78 buildings providing beautiful and adequate community facilities. The project will be operated by a qualified non-profit organization, The Foundation for Specialized Group Housing. Occupancy is restricted to senior citizens who qualify."

The city owned the property at the time of the application but a month later the city conveyed the property to University City, Inc., a corporation organized for profit.

Although its planning commission recommended denial of the application,[2] the city issued the conditional use permit in June as follows:

"That Conditional Use Permit, Case No. 4826, requested by The Foundation for Specialized Group Housing to construct and operate a non-profit

---

[1]The judgment also denied a petition for writ of mandate seeking to compel defendant city to approve conversion of the apartments to condominiums. Although plaintiffs appealed, they have abandoned their appeal from this part of the judgment.

[2]The planning commission objected to the project's density; the developers claimed that because the project was for senior citizens, it would house fewer people than a similar project not so limited.

Senior Citizens Housing project located south of Governor Drive between Genesee Avenue and Boundary Freeway, in the R-1 zone, documented as No. 639744, May 31, 1962, in the office of the City Clerk, be, and the same is hereby approved subject to the following conditions:

"1. That prior to the issuance of any building permits, complete building plans of the proposed senior citizens housing project (including signs) shall be submitted to the Planning Director for approval. Said plans shall be in substantial conformity with Exhibit 'A' on file in the Office of the Planning Department. The property shall be developed in accordance with the approved building plans except where regulations and this and/or other governmental agencies require deviation therefrom."

Seven additional conditions were appended to the permit relating to matters such as the filing of a subdivision map, landscaping and parking, but none of the other conditions mentioned "senior citizens" or "nonprofit." The conditional use permit was not recorded by the county recorder. There is no provision in the permit expressly prohibiting sale or transfer of the property.

The foundation did not acquire the property or construct or operate the project. University City, Inc., in 1963 submitted a revised plot plan reducing the number of units, deleting a medical facility, and adding a nine-hole golf course. The documents submitted did not include any references to "senior citizens" or "nonprofit." The revision was approved.

The property was transferred between several profit corporations apparently affiliated with University City, Inc., and was ultimately built with private financing insured under section 221 of title II of the National Housing Act (12 U.S.C.A. § 1715*l*) as low- and moderate-income housing rather than section 231 of the act (12 U.S.C.A. § 1715v). Tenants initially were limited to those 50 years of age or older.

The developers were able to rent only about one-third of the units, and they defaulted on the federally insured financing. The Department of Housing and Urban Development (HUD) acquired the project from the lender in accordance with its insurance agreement and operated the project for nearly three years renting to persons twenty-one years of age or older. In 1968, HUD sold the properties to an affiliate of one of the plaintiffs and the predecessor of the other. HUD received a down payment and a note secured by deed of trust for more than $6 million. After the HUD sale, the property was owned and operated by profit corporations under a letter agreement with HUD. Under the agreement, the total amount of rent to be charged

was fixed to cover estimated expenses and debt service and to provide a profit to the owners. It does not appear that any means test was applied to tenants. Property taxes were paid on the property.

The property was refinanced, and the HUD note was paid off. In 1979 plaintiffs filed an application for a tentative subdivision map to convert to condominium units. The city denied the application.

Plaintiffs then commenced the instant proceeding to compel the city to permit conversion to condominiums. They also sought declaratory relief. The city answered and filed a cross-complaint seeking an injunction to require plaintiffs to operate the project on a nonprofit basis and to rent only to senior citizens. One of the tenants and the tenants' association intervened and supported the city's position.

The trial court denied the petition for writ of mandate and enjoined plaintiffs from operating the apartments on other than a nonprofit basis and from renting any apartment unless one tenant in it is at least 55 years old. Nonprofit basis was defined as meaning that "gross operating income does not exceed reasonable operating expenses."[3]

THE CONDITIONAL USE PERMIT

A. *Existence of a Restriction*

Plaintiffs first contend that the conditional use permit did not restrict the use of the property to nonprofit senior citizen rental housing because the express conditions of the permit did not include requirements that the property be used for senior citizens on a nonprofit basis. It is urged that only the conditions enumerated restrict the permit, that the terms nonprofit and senior citizen appear in the recitals of the permit, that there is no reference to nonprofit in the conditions and that the only reference to senior citizen in the conditions is merely to describe the project and is not a limitation.

Ordinarily, a zoning ordinance permits certain uses for an area but provides that other uses may be permitted after consideration by a governmental agency as to whether the proposed other use will be in the best interests of public convenience and necessity and not contrary to the public welfare. (*Upton* v. *Gray* (1969) 269 Cal.App.2d 352, 357 [74 Cal.Rptr. 783]; *Tustin*

---

[3]During the pendency of this proceeding, plaintiffs increased rents; we stayed further increases.

*Heights Assn.* v. *Bd. of Supervisors* (1959) 170 Cal.App.2d 619, 626 [339 P.2d 914].)  ■  A conditional use permit, unlike a nonconforming use, allows a use permitted rather than proscribed by the zoning regulations, but because of the possibility that the permitted use could be incompatible in some respects with the applicable zoning, a special permit is required. (*County of Imperial* v. *McDougal* (1977) 19 Cal.3d 505, 510 [138 Cal.Rptr. 472, 564 P.2d 14].)

■  When a conditional use permit is obtained, the permittee may make those uses of the property authorized by the zoning ordinance in the absence of a permit and in addition those uses authorized by the permit. But the conditional use permit does not permit uses authorized neither by the permit nor by the zoning ordinance without permit. Thus, the use permitted is both a grant of authority to use and a limitation on the authorized uses of the property.

The conditions of the permit further limit the authority to use the property pursuant to the use permit, and if the permittee exercises its authority to use the property in accordance with the permit, it must accept the burdens with the benefits of the permit. (*County of Imperial* v. *McDougal, supra,* 19 Cal.3d 505, 510-511.) Absence of conditions in the use permit does not mean that the permittee may make uses of the property permitted neither by the use permit nor by the zoning ordinance without permit.

■  We reject plaintiffs' claim that the absence of express conditions limiting the use to nonprofit and senior citizens means that the property was not limited to those uses. The use of the property after issuance of the permit was limited to those uses permitted by the zoning ordinance in the absence of permit and the one authorized by the permit, a "non-profit Senior Citizens Housing project."

B. *Interpretation and Validity of the Restriction*

■  Plaintiffs next urge, and the Court of Appeal concluded, that the terms of the conditional use permit are vague, uncertain and ambiguous and may not be enforced.[4] However, the permit must be read in the light of the

---

[4]In concluding that the conditional use permit was vague, uncertain and ambiguous, the Court of Appeal pointed out:

"The National Housing Act (tit. 12, U.S.C.A., ch. 13, §§ 1701-1750g) refers to public or nonprofit private agencies. 'The term "corporation" means any incorporated private institution or foundation [¶] (A) no part of the net earnings of which inures to the benefit of any member, founder, contributor, or individual; [¶] (B) which has a governing board (i) the membership of which is selected in a manner to assure that there is significant represen-

application for it, and when that is done, it is apparent that the terms of the permit are clear. The application shows that the nonprofit senior citizens housing project is described in the Federal Housing Act, title II, section 231. The permit states that the application is "approved." It is apparent that the city council by approving the application intended that the term "non-profit Senior Citizen Housing project" in the permit have the same meaning as that term is given in the application, a project "under the requirements specified" in section 231. That section establishes the definition of nonprofit senior citizen housing.

Section 231 added in 1959 (73 Stat. 665 [12 U.S.C.A. § 1715v]) established a program for insurance of mortgages on housing for the elderly by the federal government. The purpose of the section "is to assist in relieving the shortage of housing for elderly persons and to increase the supply of rental housing for elderly persons." The term "elderly person" is defined as any person who is 62 years of age or over. The word "housing" is defined as eight or more new or rehabilitated living units, not less than 50

---

tation of the views of the community in which such project is located, and (ii) which is responsible for the operation of the housing project assisted under this section; and [¶] (C) which is approved by the Secretary as to financial responsibility.' (§ 1701q(d)(2).)

"Nonprofit activities, nonprofit associations, nonprofit charitable organizations, nonprofit community organizations, nonprofit cooperative associations, nonprofit corporations, nonprofit organizations, nonprofit property owners' associations and other nonprofit agencies found in our codes suggest myriad forms of such activities and include specific definitions (see West's Ann. Cal. Codes, Gen. Index, MO to Q (1981 ed.)).

"The phrase 'senior citizen' did not have a legal or dictionary definition in 1962. The National Housing Act, *supra,* as of 1962, defined elderly persons as 62 years of age or older (§ 1701q(d)(4); § 1715*l*(f); § 1715v(a)(2)). The Slum Clearance, Urban Renewal and Farm Act defined elderly persons as 62 years of age or older (tit. 42, ch. 8A, § 1471). The Social Security Act defines an aged individual as 65 years or older (tit. 42, U.S.C.A., ch. 7, Social Security, § 1382c; § 1395c). . . .

"California legislation enacted since 1962 uses various phrases in reference to older persons. The California Interdepartmental Committee on Aging provides services and programs for 'older Californians' (Welf. & Inst. Code, §§ 9340-9353) and area agency aging advisory councils are concerned with 'older persons' (Welf. & Inst. Code, §§ 9360-9365). The Elder Abuse Reporting Act refers to an 'elder' as a person 65 years of age or older (Welf. & Inst. Code, §§ 9380-9386). In 1977, the phrase 'senior citizen' first appears in the Multipurpose Senior Citizens Project legislation in defining a 'senior citizen' as a person 65 years of age or older (Welf. & Inst. Code, §§ 9400-9413) and in 1983 the Multipurpose Senior Services Program provided for persons aged 65 or older (Welf. & Inst. Code, §§ 9520-9527) and the Foster Grandparent Program refers to those participating as being 60 years or older (Welf. & Inst. Code, §§ 9400-9409). The Senior Companions Program defines adults 60 years of age or older as 'senior companions' (Welf. & Inst. Code, §§ 9540-9544). The California Community Crime Resistance Program defines an 'elderly or senior citizen' as an individual 55 years of age or older (Pen. Code, § 13841, subd. (b)). A claimant under the Senior Citizens Homeowners and Renters Property Tax Assistance Law is an individual 62 years of age or older (Rev. & Tax. Code, § 20505) who owns or rents a residence. The California Commission on Aging acts on behalf of 'older persons' (Welf. & Inst. Code, § 9201)."

percent of which are specially designed for the use and occupancy of elderly persons.

The section provides that the mortgages insured may be equal to the lesser of certain maximum amounts per unit and replacement cost of the project if executed by a nonprofit corporation or public agency, and if not so executed, 90 percent of replacement cost, which may include an allowance for builder's or sponsor's profit and risk of 10 percent of costs other than land. A nonprofit corporation is organized for purposes other than profit of the organization or persons identified with it. (24 C.F.R. § 231.2(j).) The nonprofit corporation is one "regulated or supervised under Federal or State laws or by political subdivisions of States, or agencies thereof, or by the Secretary under a regulatory agreement or otherwise, as to rents, charges, and methods of operation." (12 U.S.C.A. § 1715v(c)(3).)

Under the section the mortgage must provide for a complete amortization. (12 U.S.C.A. § 1715v(c)(5).) The section incorporates provisions (12 U.S.C.A. § 1713) dealing with foreclosure for default, operation by HUD of properties acquired, and resale.[5] When property is acquired, the property may be sold for cash or credit or leased in the discretion of the Secretary of HUD for the protection of the insurance fund. (12 U.S.C.A. § 1713(l); 24 C.F.R. § 290 et seq.)

Although section 231 does not use the term "senior citizen" but instead the term "elderly person," the two terms must be treated as identical, otherwise the section, contrary to the express terms of the application, would not be applicable. It is also clear that "nonprofit" as used in the section means a nonprofit corporation as mortgagor; the word is not used in the section to refer to operation on a nonprofit basis.[6]

We conclude the conditional use permit incorporated the provisions of section 231 and therefore the permit is not vague, uncertain or ambiguous in using the term nonprofit senior citizen housing. However, it does not follow that the injunctions may be sustained on the basis of the permit.

---

[5]Section 221 of title II of the National Housing Act under which the project was originally financed contains roughly similar provisions for insurance of mortgages for housing for low- and moderate-income families and displaced families. (12 U.S.C.A. § 1715l.)

[6]A nonprofit organization which successfully manages a section 231 project would ordinarily make substantial gains. As pointed out above, the mortgage must provide for complete amortization (12 U.S.C.A. § 1715v(c)(5)), and during the amortization period, a successful nonprofit organization would be building equity and at the end of the period it would be in the same position as any other owner which had paid off its mortgage. Increases in equity would permit a nonprofit organization dedicated to providing housing for the elderly to refinance and build additional projects, furthering the congressional purpose of increasing the supply of housing for the elderly.

C. *The Condition and the Injunction*

■ The permit did not restrict the use of the property to nonprofit senior citizen housing in the event that HUD was required to take over the project under its guarantee. When HUD took over the property, it was not under a duty to sell the property to a nonprofit agency but could sell to profit-making organizations, and it was not under a duty to limit the use of the property to senior citizens or moderate- or low-income tenants.

The permit, as we have seen, incorporates the provisions of section 231. Thus it incorporates the part of the section expressly incorporating the provisions of 12 United States Code Annotated section 1713(*l*). (12 U.S.C.A. § 1715v(e); see also 12 U.S.C.A. § 1715*l*(g).) The term "non-profit Senior Citizens Housing Project" in the permit used to describe the project described in the application may not reasonably be interpreted to incorporate the provisions of section 231 and at the same time to exclude some of the provisions of the section. Under section 1713(*l*) HUD is authorized to sell property acquired for cash or credit in its discretion for the protection of the insurance fund. While local concerns and the purposes for which the project was built are factors to be considered in disposing of multifamily projects, the factors are to be considered along with HUD's objective of protecting the financial interests of the government and producing a satisfactory return to the mortgage insurance funds. (24 C.F.R. § 290.20.) Obviously, limitation of sale to a nonprofit agency could seriously impair HUD's ability to protect the insurance funds. Since the permit provision for nonprofit senior citizen housing contemplated sale to a profit-making organization by HUD upon such limitations as it found proper, the trial court could not properly impose additional limitations on the basis of the provision.

Because the conditional use permit authorized a section 231 project, HUD, once it acquired the property under its guarantee, had the power to determine to whom it would sell and the restrictions to be placed on the purchaser. It does not appear that plaintiffs are in violation of any HUD restrictions.

D. *Failure to Comply With the Permit*

The developer of the project did not proceed under section 231 and the project was not operated by the Foundation for Specialized Group Housing,

a nonprofit corporation, as provided in the application for the permit. Thus the project was not built and operated in accordance with the permit. Section 231 financing and regulation applies only to new projects and certain new rehabilitation projects. It does not seem possible at the present time to comply with the permit without tearing the project down.

■ The question arises whether the failure to comply with the permit or other applicable zoning furnishes a ground to require the present owners of the project to operate on conditions other than those specified in the permit.

While there may be other cases where the failure to comply with a permit might justify regulations other than those provided for by the permit, this is not such a case. First, the present owners are not the ones who failed to comply with the permit. Secondly, it does not appear that the failure to comply with the permit requirement of financing under section 231 and operation by a nonprofit corporation was of substantial importance in the light of subsequent events. The developer, a profit-making corporation, proceeded under section 221, and it defaulted. The provisions of section 221 and 231 are the same in most relevant respects except that section 221 is limited to moderate- and low-income housing while section 231 requires at least one-half of the units be designed for the elderly. Since the elderly can also rent section 221 housing, it does not appear how section 231 housing would have increased the number of tenants.[7] Similarly, it does not appear how a nonprofit operator would have been able to rent substantially more than one-third of the units and prevented default.[8]

The portion of the judgment enjoining plaintiffs from renting except to senior citizens on a nonprofit basis is reversed.

Mosk, J., Reynoso, J., Grodin, J., Lucas, J., and Kaus, J.,* concurred.

---

[7]A 1978 survey showed that 72 percent of the units were occupied by persons 67 or older.

[8]There is no reason to assume that the initial rents at a project built under sections 221 and 231 will vary significantly if the project is owned by a nonprofit rather than a profit corporation.

So long as the builder is able to construct the project at or below the maximum allowed per unit, rents should not be substantially affected by the fact that the owner of the project is a profit-making organization rather than a nonprofit agency. The nonprofit owner may obtain a larger loan on the property, requiring larger principal and interest payments to amortize, and the difference should largely offset the profit on investment allowed the profit-making organization.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

**BIRD, C. J.,** Concurring and Dissenting.—I write separately to express my concern that the majority's result undermines the City of San Diego's legitimate efforts to provide affordable rental housing for the poor and elderly.

Although I agree with the majority's conclusion that the provisions of the conditional use permit are valid and binding upon successors-in-interest (see majority opn., *ante,* at p. 816), I cannot agree that the violation of these terms does not justify the imposition of an injunction.

The majority posit that the Department of Housing and Urban Development's (HUD) ability to protect its mortgage insurance funds would be seriously impaired if the limitations in the permit were deemed applicable to HUD and subsequent purchasers. That conclusion is somewhat surprising given the marked lack of evidence in the record to support it. The majority evade this problem by creatively holding that (1) HUD has the power to determine the restrictions to be placed on a property once HUD acquires it; (2) this power was implicitly authorized in the original permit; and (3) the conditions delineated in the permit are superfluous and, therefore, constitute "additional limitations" which equity deems unenforceable. (Majority opn., *ante,* at pp. 818-819.)

Contrary to the majority's assertion, Title II of the National Housing Act (12 U.S.C.A. § 1713(*l*)) does *not* authorize HUD to ignore land use regulations propounded by the city in the name of ensuring a satisfactory return on insurance funds. (Majority opn., *ante,* at p. 818.) Moreover, even assuming that it did, there has not been an adequate showing that "HUD's objective of protecting the financial interests" of the fund (majority opn., *ante,* at p. 818) justifies the denial of safe and sanitary housing for the elderly and other vulnerable groups.

California faces an acute shortage of decent housing for its citizens. In 1980, the Legislature recognized this shortage as one of California's more pressing public concerns. It declared the attainment of a "suitable living environment for every California family" to be "a priority of the highest order." (Gov. Code, § 65580; see also *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97 [207 Cal.Rptr. 285, 688 P.2d 894].) While the private marketplace may meet the housing needs of those at higher income levels, the needs of other economic segments remain unfulfilled.

I am concerned that the majority's interpretation of the relevant sections of the National Housing Act (12 U.S.C.A. §§ 1715v, 1713(*l*)) would enable the circumvention of the city's carefully drafted plan to ensure affordable

housing for *all* of its citizens. In light of these concerns, I cannot join the opinion of my brethren.