Filed 3/8/13  Noxsel v. Boquet Estates Owners Assn. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| E. RAY NOXSEL, as Trustee etc., | |
|     Plaintiff, Cross-defendant and Appellant, | E053305 |
| v. | (Super.Ct.Nos. CIVRS704624 & CIVRS809589) |
| BOQUET ESTATES OWNERS ASSOCIATION, | OPINION |
|     Defendant, Cross-complainant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County.  David A. Williams, Judge.  Affirmed.

Ward & Ward and Alexandra S. Ward for Plaintiff, Cross-defendant and Appellant.

Law Offices of Edward W. Hess, Jr., Edward W. Hess, Jr.; Slaughter & Regan, Barry J. Reagan and Gabriele M. Lashly for Defendant, Cross-Complainant and Respondent.

1

# I

## INTRODUCTION

Plaintiff and appellant E. Ray Noxsel[1] and respondent Boquet[2] Estates Owners

Association (HOA), have sued one another in a dispute involving 59 garages, owned by

Noxsel as part of a condominium development. Noxsel contends that the garages can be

rented or sold to anyone, including members of the general public. In contrast, the HOA

contends that Noxsel can rent or sell the garages only to HOA members and not to

members of the general public. With regard to HOA assessments, the parties disagree on

how much the assessments may be increased each year.

On appeal, Noxsel contends the trial court misinterpreted the covenants,

conditions and restrictions (CC&Rs) for the Boquet Estates development (Boquet), as

well as the 1977 conditional use permit (CUP) issued by the City of Upland (Upland).

Noxsel also argues the court misapplied Civil Code section 1366. Noxsel seeks a

reversal of the judgment and the award of attorney's fees to the HOA.

The fundamental contention advanced by Noxsel is that the CUP and the CC&Rs

should be interpreted to allow sale or rental of the garages to anyone, not limited to

owners of the Boquet condominiums. As the reviewing court, we have thoroughly

---

[1] Trustee of the E. Ray Noxsel Charitable Remainder Unitrust #21 dated
December 22, 2006 (the Trust), and the Trust (collectively, Noxsel),

[2] "Boquet" is the spelling used in the covenants, conditions and restrictions.

examined the trial record and the appellate briefs submitted by the parties.[3] Like the trial court, we disagree with Noxsel's proposed interpretation of the written documents. We conclude the CUP and the CC&Rs unambiguously prohibit Noxsel from selling or renting the garages to the general public.

We conduct a combined review, engaging in independent contractual and statutory interpretation, and find the trial court did not abuse its discretion in enjoining Noxsel from selling or renting the 59 garages to the general public. Additionally, we affirm the trial court's rulings on the amount and allocation of the HOA assessment fees and the trial court's grant of attorney's fees to the HOA.

## II

## STATEMENT OF FACTS

A. *The CUP and the History of the Boquet Estates Development*

In 1977, Noxsel began to develop Boquet, a planned residential development consisting of 64 condominium lots and 60 separate garage lots in Upland. Each condominium lot included an attached two-car garage; each garage lot was improved with a single-car garage. The single-car garage lots are located in a separate row and are not attached to the condominiums.

---

[3] At oral argument, Noxsel's counsel protested this court had not considered large portions of appellant's brief. We not only considered the entire appellant's opening brief, we also note about half consisted of boilerplate recitations of legal principles of which this court is cognizant and large verbatim portions of the record. As we discuss below, Noxsel's argument depends on this court accepting his interpretation of the CUP and the CC&Rs.

In January 1977, Noxsel obtained a CUP from Upland. The CUP included a condition of approval, requiring the Boquet CC&Rs to "include a provision that all one-car garages shall be under Homeowner's Association control and no ownership of any such garage shall be transferred to any non-member of said Association."

B. *The CC&Rs*

The recorded CC&Rs contain the following relevant provisions, which define many of the terms to be discussed. According to article I, Definitions:

"7. A 'lot' shall mean any numbered plot of land, together with the residential and other improvements thereon, . . .

"8. A 'member' shall mean every person or entity who holds a membership in the Association. [¶] . . . [¶]

"10. An 'owner' shall mean each person and entity holding a record ownership interest in a lot, . . ."

According to article III, Use Restrictions:

"1. <u>Residential, Garage and Land Use</u>. Lots shall be used for residential purposes only, . . . Nothing herein shall prevent an owner from leasing or renting his lot, . . ." provided the lessee or renter is subject to HOA regulation as discussed in Article XIV.

"2. <u>Commercial Use</u>. . . . no part of the development shall ever be used or caused, allowed or authorized to be used in any way, directly or indirectly, for any business, commercial, manufacturing, mercantile, storing, vending, or other such non-residential purpose, . . ."

4

"4. Offensive Conduct; Nuisances. No noxious or offensive activities shall be carried on upon, or within the development, nor shall anything be done thereon which may be or become an annoyance or nuisance to the residents of the development, or which shall in any way interfere with the quiet enjoyment of owners or occupants of lots."

"5. Parking Restrictions; Use of Garages. . . . Garages shall be used for parking and storage only and shall not be converted for living or recreational activities. . . ."

"12. Compliance with Laws, Etc. . . . No owner shall permit anything to be done or kept on his lot which is in violation of any law, ordinance, statute, rule or regulation of any local, county, state or federal body."

According to article V, Membership and Voting Rights, "[e]ach owner of a lot, or interest therein, shall be a member of the Association. Ownership of a lot or interest therein shall be the sole qualification for and entitlement to membership in the Association" until ownership or interest ceases. The CC&Rs define a member's rights, duties, and obligations. Any transfer of ownership or interest transfers the membership rights automatically to the new owner.

At trial, Noxsel asserted that, according to Article VI, anyone can become an HOA member by buying a garage, thereby satisfying the condition of the CUP that no ownership of a garage shall be transferred to a nonmember of the HOA. Noxsel testified that a buyer of a garage becomes an HOA member "during the sale." Noxsel elaborated

5

further "that if a person bought a single-car garage, they automatically become a member" of the HOA and under its control.[4]

Regarding Assessments, article VI provides that total assessments should be allocated 90/10 between the condominium lots and the garage lots. Any increase in the total assessment is limited to 20 per cent annually.

Finally, article XIV governs the rental or leasing of lots, including making the renter or lessor subject to HOA regulation.

*C. Noxsel's Ownership and Rental of the Garage Lots*

The 64 condominium lots were sold but the garage lots were not sold. Ultimately Noxsel retained ownership of 59 garage lots.[5] Over the years, Noxsel continued to offer the garage lots for sale to the public and also began renting the lots.

In 1982, Upland notified Noxsel that he was violating the city's zoning laws by selling or renting the garage lots to anyone except an owner or purchaser of a condominium lot. The Upland city attorney strongly emphasized: "It is the clear intent of [the CUP] that the owners of any one car garages . . . should also be homeowners. . . . It is clear . . . that the City contemplated only that homeowners within the tract would be owners of the garages and that we could not spew [*sic*] the ownership of garages out to people who . . . did not own homes in the tract itself. The city attorney explained, "The

---

[4] Presumably, the same transformation from nonmember to an HOA member would apply to a renter of a garage.

[5] The 60th garage lot was purchased at a foreclosure sale by the Thompsons who are not parties in this action.

6

ownership of a garage on a separate parcel of land . . . would be clearly in violation of our zoning ordinance," allowing only residential and incidental uses: "[E]ven if you allow someone to come into your homeowners association as a member, you still have the basic problem of having a use which is not incidental to the dwelling use as far as the owner is concerned. . . . This is nothing more than a storage and lock facility. I assumed that your interpretation [c]ould allow one man to join your homeowners association and own all 60 garages if he wanted to buy them. He would then rent all 60 garages as a store and lock concession using one of your tenants as the storekeeper. [¶] The City could not[,] under any circumstances, permit the independent sale of your one car garages. . . ."

The city attorney's reasoning is consistent with the 2010 version of the Upland Municipal Code, Chapter 17.54.030, providing: "The following accessory structures and land uses may be permitted in the RM [Multiple Family Residential] zones, only where clearly incidental to a permitted primary use of structures: [¶] A. Accessory buildings and uses including, but not limited to: [¶] . . . [¶] 2. Noninhabitable accessory buildings and structures, including garages, carports, storage areas, and tool sheds."

In a second 1982 letter, the city attorney continued: "Under no circumstances and I repeat, under no circumstances, could the City permit 60 garages to be sold in a residential zone to people who do not live in a residential structure to which the garages are appurtenant. This is definitely a requirement in a residential zone." In 1986, Upland reiterated its position that renting the garage lots was a prohibited commercial use, violating the CUP and the city's zoning law. Between 1978 and 2002, Noxsel discussed Upland's concerns on several occasions. In 2004, the city attorney again notified Noxsel

7

that "third party rental" of the garage lots was never intended and suggested Noxsel seek to amend the existing CUP. Apparently, Upland never pursued any legal action against Noxsel for renting or selling the garage lots.

In 2002, Noxsel sold all 60 garage lots to Jamie Naranjo. After Naranjo sued Noxsel, Noxsel took back ownership of 59 lots in December 2006. After reacquiring title, Noxsel again began renting the garage lots to nonowners.

Noxsel advertised the garages for rent as storage units. All potential renters were screened by Noxsel's property manager. The garages rented for $100 a month. Approved renters signed a written rental agreement and were required to comply with the HOA's regulations. No renter was permitted to have keys to use the Boquet common area facilities, other than the alley driveway which is accessible by the general public. The complaints received about the garage renters involved minor issues–such as missing locks or garages that were not properly secured after being vacated–and more serious complaints–such as claims of people purportedly living in or running businesses out of the garage lots.

D. *Assessments*

During the time Noxsel served on the HOA Board, the 90/10 allocation of the total assessment was never made. Instead, the respective assessments imposed on the condominium lots and garage lots were recommended to the board by a hired consultant. Between 1978 and 2003, the regular monthly assessments on the garage lots ranged from a low of $1.27 to a high of $3.40. When Noxsel sold the garage lots to Naranjo, the monthly regular assessments were $2 per lot.

8

In late 2003, based on the CC&Rs's 90/10 split requirement, the HOA board voted to increase the total assessment from $70,560 to $82,416—less than 20 percent. According to the 90/10 allocation, the condominium assessment increased from $90 to $97 per month and the garage assessment increased from $2 to $11 per month. Since 2003, the 90/10 assessment allocation has been used by the HOA board when setting the amount of the monthly regular assessments, resulting in an $11 per month regular assessment on each garage lot from 2004 through 2010. Noxsel tried to pay an assessment of $2 monthly on the garage lots but the HOA refused to accept his tender and he stopped trying to pay. The HOA billed Noxsel for assessments at the higher rate of $11 per month per garage lot. When those amounts were not paid, the HOA placed liens on the 59 garage lots.

*E. The Pleadings*

In September 2007, Noxsel filed a complaint for declaratory relief and a permanent injunction, seeking a determination about the assessments and enjoining the assessments, as well as related damages.

In November 2007, the HOA filed a cross-complaint for foreclosure of its assessment liens and for a judicial declaration prohibiting the sale or lease of the garage lots to the public.[6]

---

[6] In September 2008, Noxsel filed a second action for declaratory relief and emotional distress caused by voting irregularities in the HOA election conducted in February 2008. The parties stipulated to consolidate the actions.

*F. The Trial and Statement of Decision*

A two-day court trial was conducted in October 2010. The court filed a statement of decision. It found that the letters by the Upland city attorney notified Noxsel that renting the garages to the general public was a zoning violation and violated the CUP. It also found that the CC&Rs "clearly state that no one is to own a garage unless they are a current member of the condominium [*sic*]." Over the years, Noxsel had succeeded in arguing that "he was free to rent the garages and sell the garages to outside parties as they would then become members of the association." Noxsel was also able to block Upland from enforcing its zoning laws.

The court concluded that Noxsel "is in fact conducting a commercial operation renting out the garages to the general public as storage units." The commercial operation violates the CUP and the Upland Municipal Code. Noxsel has been on notice of his illegal activities since 1982. Noxsel is also violating the CC&Rs prohibiting commercial operations. Under the CUP and the CC&Rs, Noxsel cannot own or rent the garages to anyone except HOA owners and is enjoined from doing so. The court ordered Noxsel to desist his storage rental as of January 31, 2011. The amount of the annual assessments and the 90/10 allocation were valid actions by the HOA. The HOA could not obtain judicial foreclosure of the delinquent assessment amounts but Noxsel owed past due assessment fees of $25,254.

The court entered judgment in February 2011. After the HOA's motion, the court awarded attorney's fees of $82,272.21 to the HOA.

10

INJUNCTION AGAINST SALE OR RENTAL OF GARAGES

*A.      Standard of Review*

On the issue involving the sale or rental of the garage lots, Noxsel urges this court to conduct an independent review of the record, engaging in contractual interpretation of the CUP and the CC&Rs—which Noxsel contends are clear and unambiguous–and determining that the trial court committed a plethora of legal error.  (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866; *250 L.L.C. v. PhotoPoint Corp.* (2005) 131 Cal.App.4th 703, 726; *Schaefer's Ambulance Service v. County of San Bernardino* (1998) 68 Cal.App.4th 581, 586.)

In contrast, the HOA asserts the proper standard of review for granting an injunction is abuse of discretion and substantial evidence.  (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 390; *Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

As a preliminary matter, we agree this court properly conducts an independent review of the CUP and the CC&Rs and in interpreting the Upland zoning laws.  But, after concluding the written documents and the law favor the HOA, we decide the trial court did not abuse its discretion in enjoining Noxsel from selling or renting the garages to the public.  As discussed fully below, we conclude the record does not support Noxsel's untenable position that the CC&Rs clearly and unambiguously permitted Noxsel to sell or rent the garages to the general public in violation of the CUP and Upland zoning laws.

On the other hand, substantial evidence supports the trial court's findings in the statement of decision.

B. *Interpretation of the CUP and the CC&Rs*

Noxsel contends the CUP and the CC&Rs are susceptible to different interpretations. We do not agree. The CUP granted by Upland in 1977 expressly required that the garage lots could not be transferred to a nonmember. At trial, Noxsel testified that, in order to comply with the CUP, the CC&Rs were drafted to define the terms lot, owner, and member and to provide that the owner of a lot, including a garage lot, would automatically become a member. Noxsel further testified to his understanding that the purchaser of a garage lot becomes a member of the HOA and under the HOA's control through the act of purchasing the lot, "during the sale."

The CUP, however, prohibits a nonmember from buying or renting a garage lot.[7] As recognized by the trial court, Noxsel's proposed interpretation, would render the CPU's restrictions meaningless or "completely void because you can sell it to anyone because the minute you transfer, they're members." Nor do the CC&Rs expressly allow a nonmember to buy or rent a garage lot. It is only by applying Noxsel's convoluted reasoning that a nonmember buying or renting a garage lot is transformed into a member. Even if there was confusion on this point, it was caused by Noxsel, as the developer who created the CC&Rs, and cannot be used to his advantage in his present capacity as

---

[7] The CUP's restriction on renting or selling garage lots does not apply to condominium lots which necessarily transfer membership when sold.

12

trustee.  (Civ. Code, § 3517; *Salehi v. Surfside III Condominium Owners Assn.* (2011) 200 Cal.App.4th 1146, 1156.)

Based on our independent and de novo review, we hold on appeal that there is no lack of clarity or ambiguity in the governing documents that would allow the strained interpretation proposed by Noxsel.

## C.  Additional Arguments by Noxsel

Our conclusion about the express, unambiguous meaning of the CUP and the CC&Rs means that many of the other issues raised by the parties are effectively resolved without requiring elaborate analysis.  But, in response to Noxsel's criticisms of the tentative opinion, we address them summarily here.

### 1.  Commercial Use of the Garages

Although not the basis for our opinion, the HOA's position is bolstered by the fact that the CC&Rs allow lots to be used only for residential purposes.  No commercial uses whatsoever are permitted, especially those which might be deemed an annoyance or nuisance to residents, including living or recreational activities.  Like the trial court, we agree that Noxsel was operating a commercial enterprise in which he advertised the garages as storage space, employed a property manager, and used a commercial lease for garage tenants.  Under these circumstances, it is unsustainable for Noxsel to assert that his activities were not commercial.

### 2.  The CUP Restrictions and Zoning Laws

Again, although not the basis for our opinion, the CC&Rs prohibit any activities that violate any laws, like Upland zoning codes.  (*City and County of San Francisco v.*

13

*Padilla* (1972) 23 Cal.App.3d 388, 401.)  Beginning in 1982, Upland has continuously warned Noxsel that he was violating the conditions of the CUP and Upland's zoning laws.  For more than 30 years, Noxsel has violated Upland's zoning prohibition against commercial use of residential property and any use which is not "clearly incidental" to a permitted use.  Even without the relevant restriction in the CUP, Noxsel could not engage in a use contradicting zoning restrictions.  (*Sports Arena Properties, Inc. v. City of San Diego* (1985) 40 Cal.3d 808, 812.)

For these reasons, Noxsel's arguments that the HOA could not present expert testimony about violations of the present zoning law–which is consistent with the law in 1982 and before that date–are not compelling.  The testimony of Jeffrey Bloom, an Upland city planner, about the present zoning ordinances was not necessary to support the trial court's finding or to our conclusion that Noxsel was, in fact, violating the CC&Rs and the law by renting or selling the garages.

*3.  Restraint on Alienation and Other Arguments*

We also reject Noxsel's complaint that he will suffer economic loss because he cannot rent or sell the garages to anyone.  In fact, as was probably contemplated originally, the garages can be sold or rented to the HOA or to residents of the condominium development for personal use for additional storage.  The CC&Rs however, do not allow Noxsel to rent or sell the garages to the public at large even if he managed to do so to his economic benefit for more than 30 years.

All of Noxsel's additional arguments depend on the same persistent faulty reading of the CUP and the CC&Rs.  In light of our holding, Noxsel cannot argue there has been

14

an improper amendment of the CC&Rs.  There has been no such modification.  We also reject Noxsel's claims that the outcome of this case is "unlawful, unreasonable, unjust, unfair, inequitable, and harsh."  The trial court did not commit prejudicial error when it found Noxsel could not rent or sell the garages to the public.

Our decision on how to interpret the CUP and the CC&Rs resolves the issue about the sale or rental of the garages to the public.  The trial court did not abuse its discretion in granting the injunction against Noxsel.  The injunction is necessary to bar the commercial use of garages for storage in residential areas, where it is permissible only when "clearly incidental" to a permitted use, as established in the CUP, the CC&Rs, and Upland zoning law.

IV

THE INCREASED ASSESSMENT

Civil Code section 1366 requires condominium homeowners associations to assess fees on the individual owners in order to maintain the complexes.  (*Bear Creek Master Assn. v. Edwards* (2005) 130 Cal.App.4th 1470, 1489, citing *Park Place Estates Homeowners Assn. v. Naber* (1994) 29 Cal.App.4th 427, 431-432.)  "'These statutory provisions reflect the Legislature's recognition of the importance of assessments to the proper functioning of condominiums in this state'" and that homeowners associations would cease to exist without regular payment of assessment fees.  (*Bear Creek,* at p. 1489.)  In this case, the increase in the garage assessment from $2 to $11–after many years of assessments that were too low–did not violate Civil Code section 1366, subdivision (b).

15

According to the Boquet CC&Rs, the owners of the 60 garage units were to pay 10 percent while the owners of the 64 condominiums units were to pay 90 percent of the assessment. This formula was not followed during the years in which appellant was an HOA board member, resulting in the garage units being assessed at a much lower rate than 10 percent. In 2004, the board passed an assessment which increased the total assessments from $70,560 to $82,416 per year, which is less than a 20 percent increase. The board also assessed the garage units at 10 percent, as required under the CC&Rs, which resulted in an increase of the garage units from about $2 to $11 per unit. Noxsel objects to this increase of "550%" in the garage assessment.

The trial court correctly determined that the board could pass the increase without member approval and that the increase did not violate article VI, section 8 of the CC&Rs or Civil Code section 1366, subdivision (b). Both article VI, section 8 of the CC&Rs and Civil Code section 1366, subdivision (b), permit a 20 percent annual increase in the assessment.

Noxsel's argument that the increase of the assessment for the garage lots violated the CC&Rs and Civil Code section 1366 fails for various reasons. First, beginning in 2004, the increases of the total assessment were less than 20 percent per year. Article VI, section 5 "Uniform Rate of Assessment" makes it clear that the amount of the assessment is to be considered in its total, not by class of property owners, since it refers to "percent of the total assessments." Nothing in the CC&Rs or Civil Code section 1366 requires a membership vote for an assessment increase which is less than 20 percent of the total

16

assessment, even if it results in an assessment increase greater than 20 percent for certain properties.

Second, even assuming for the sake of argument, that Civil Code section 1366 or article VI, section 8 of the CC&Rs could be interpreted to require a vote of the membership for an increase of more than 20 percent for the garage lots, the requirement only applies to increases that are "20 percent greater than the regular assessment." (Civ. Code, § 1366, subd. (b).) It is undisputed that the garage units were not assessed pursuant to a regular assessment of 10 percent as required under the CC&Rs, and that the owners of the garage units had, for many years, paid much less than their 10 percent share of the regular assessment. If the garages had been properly assessed over the years, the $11 assessment imposed in 2004 and after would not have been 20 percent greater than the "regular assessment." (Civ. Code, § 1366, subd. (b).)

V

ATTORNEY'S FEES

Noxsel claims that the matter should be remanded because the trial court failed to exercise its discretion in making the award of attorney's fees when Noxsel had also achieved some success. This issue was waived because it was not raised below. (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 712.) Even if the error was not waived, the trial court did not abuse its discretion in awarding attorney's fees to the HOA.

The HOA was the prevailing party under Civil Code sections 1354, subdivision (c), and 1717, by statute and by contract. The definition of "prevailing party" for

17

purposes of statutory attorney's fees is set forth in Code of Civil Procedure section 1032, subdivision (a)(4), which defines "prevailing party" as "the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant." The HOA received a net monetary recovery in the amount of $25,254. Accordingly, the HOA was the prevailing party for purposes of statutory attorney's fees.

The HOA was also the prevailing party for purposes of contractual attorney's fees. Civil Code section 1717, subdivision (b)(1), provides that: "The court, upon notice and motion by a party, shall determine who is the party prevailing on the contract for purposes of this section, whether or not the suit proceeds to final judgment. Except as provided in paragraph (2), the party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract. The court may also determine that there is no party prevailing on the contract for purposes of this section."

The HOA obtained greater relief on the action on the contract. The court denied Noxsel's request to set aside the assessment and awarded the HOA $25,254 in unpaid assessments. Even though Noxsel prevailed in having the court set aside the suspension of appellant's voting rights, the HOA clearly obtained greater relief on the contract. The HOA also prevailed on its cross-complaint since the court permanently enjoined Noxsel from renting or selling the garage units to the public.

Accordingly, the trial court did not abuse its discretion when it awarded attorney's fees to the HOA. (*Estate of Drummond* (2007) 149 Cal.App.4th 46, 50, citing *Hsu v. Abbara* (1995) 9 Cal.4th 863, 871.)

VI

DISPOSITION

The court did not abuse its discretion in granting an injunction against Noxsel, in approving the increased assessment, or in awarding attorney's fees to the HOA. We affirm the judgment.

The HOA, the prevailing party, shall recover its costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

McKINSTER

Acting P. J.

KING

J.

19